904 P.2d 489

Robin CARR, Individually and as Pro-
chein Ami of Ellen R. Carr, a minor
child, and Donna Sorrell, Plaintiffs–Ap-
pellants/Cross–Appellees,

v.

Walter S. STRODE, Straub Clinic
& Hospital, Inc., Defendants–
Appellees/Cross–Appellants,

and

John Does 1–10, Jane Does 1–10, and
Doe Entities 1–10, Defendants.

No. 16079.

Supreme Court of Hawai'i.

Oct. 5, 1995.

Leslie S. Fukumoto, Honolulu, for plaintiffs-appellants/cross-appellees.

William A. Bordner (J. Gerard Lam, with him on the briefs, of Burke, Sakai, McPheet-ers & Bordner), Honolulu, for defendants-appellees/cross-appellants.

Before MOON, C.J., LEVINSON, NAKAYAMA and RAMIL, JJ., and VIRGINIA LEA CRANDALL, Circuit Judge, in place of KLEIN, J., recused.

MOON, Chief Justice.

This case concerns a failed vasectomy [1] operation that resulted in the unplanned birth of a healthy child. Plaintiffs-appellants/cross-appellees Robin R. Carr (Carr), individually and as prochein ami of Ellen R. Carr (Ellen), and Donna Sorrell (Sorrell) (collectively, plaintiffs) claim, *inter alia*, that defendants-appellees/cross-appellants Walter S. Strode, M.D. (Dr. Strode) and Straub Clinic & Hospital, Inc. (Straub) (collectively, defendants) failed to obtain Carr's informed consent to perform the vasectomy operation.

Although the jury returned a verdict in favor of plaintiffs on the informed consent claim, judgment was entered in favor of defendants pursuant to the trial court's grant of defendants' motion for a judgment notwithstanding the verdict (JNOV). The trial court also conditionally granted defendants' alternative motion for new trial, ruling that, if the judgment entered in their favor was vacated or reversed on appeal, defendants would be entitled to a new trial.

Plaintiffs now appeal from the judgment in favor of defendants and the trial court's conditional grant of a new trial. Defendants cross-appeal from various pretrial rulings on summary judgment motions and motions in limine as well as the trial court's giving of plaintiffs' instruction no. 11.

For the reasons discussed below, we: (1) affirm the (a) order denying defendants' motion for summary judgment, or, in the alternative, for partial summary judgment, (b) order denying defendants' various motions in limine, and (c) court's giving of plaintiffs' instruction no. 11; and (2) reverse the (a) judgment in favor of defendants, (b) conditional grant of a new trial, (c) order granting

---

1. A vasectomy is a surgical procedure designed to induce male sterility, involving "surgical removal of the ductus (vas) deferens, or of a por-tion of it." The Sloane–Dorland Annotated Medical Legal Dictionary 767 (1987).

plaintiffs' motion for partial summary judgment, and (d) order denying defendants' motion for reconsideration. Accordingly, we remand this case for a new trial on the issue of informed consent.

## I. BACKGROUND

### A. Facts

Carr and Sorrell are married, and, at the time of Carr's vasectomy, resided in Hawai'i.[2] During Sorrell's pregnancy with their second child, Carr and Sorrell decided not to have any more children because of financial and educational concerns. After she gave birth to her second child, Sorrell planned to have a tubal ligation.[3] However, because his wife had just endured nine months of pregnancy and had difficulty scheduling the tubal ligation operation, Carr volunteered to undergo the vasectomy surgery.

In November 1985, Carr had his first vasectomy consultation with Dr. Strode, a Straub employee. On December 5, 1985, Carr, accompanied by Sorrell, had a second vasectomy consultation with Dr. Strode. Dr. Strode performed the vasectomy operation on December 9, 1985, and subsequently saw Carr on December 12, 1985 for a follow-up examination. On January 13, 1986, Straub informed Carr that, because no live sperm had been found in the sperm sample analysis taken after the vasectomy, he was sterile.

In April 1986, Sorrell discovered that she was pregnant. On April 26, 1986, Carr gave Dr. Strode another sperm sample, which, upon analysis, revealed 340,000 dead sperm. At trial, Dr. Strode admitted that dead sperm could indicate that Carr was producing live sperm. On April 30, 1986, Carr submitted a second sperm sample which contained 21 sperm, six of which were live. Although Dr. Strode offered to perform a second vasectomy at no charge to Carr, Carr rejected this offer because he believed that Dr. Strode had performed the first vasectomy incorrectly.

On November 10, 1986, Carr met with Robert Lewis Simich, M.D. (Dr. Simich) to discuss a second vasectomy. However, Carr was uncertain about undergoing the second procedure because Sorrell had scheduled a tubal ligation to be performed immediately after the impending birth of their third child. Sorrell gave birth to Ellen on November 27, 1986, but no doctors were available to perform the scheduled tubal ligation because of the Thanksgiving holiday. Thereafter, because Sorrell was unable to arrange for a tubal ligation due to her work schedule, Carr decided to have the second vasectomy operation, which Dr. Simich performed on December 26, 1986.

### B. Prior Proceedings

On June 28, 1988, plaintiffs filed a five-count complaint against defendants, alleging: (1) general negligence and/or malpractice; (2) breach of warranty; (3) lack of informed consent; (4) negligent misrepresentation; and (5) permanent disruption of plaintiffs' marital relationship.

In August 1989, the circuit court entered an order granting defendants' motion for partial summary judgment, disposing of count I of the plaintiffs' complaint, relating to general negligence and/or medical malpractice. Subsequently, the circuit court denied defendants' motion for partial summary judgment, wherein they sought a ruling that child-rearing costs were not recoverable under plaintiffs' claim for wrongful pregnancy.

Plaintiffs then filed a motion for partial summary judgment limited to a factual finding that Dr. Strode failed to inform plaintiffs of either the risk of failure or the failure rate associated with a vasectomy. Although the circuit court declined to rule that defendants had breached any duty to plaintiffs, it found as a factual matter that Dr. Strode had "failed to specifically state to plaintiff Robin Carr that the vasectomy procedure might fail and if such failure were to occur that it would or could cause the plaintiff to remain fertile

---

**2.** Carr and Sorrell later moved to the Marine Corps air station in Iwakuni, Japan.

**3.** A tubal ligation is a surgical procedure designed to render a female sterile "by constricting

the uterine tubes by means of ligatures; the tubes may, in addition, be severed or crushed." The Sloane–Dorland Annotated Medical Legal Dictionary 416 (1987).

or become fertile again in the future." The circuit court, however, expressly did not otherwise limit "any party's right to offer testimony concerning information provided to Carr prior to the [vasectomy] or the surrounding circumstances thereto."

Defendants moved for reconsideration of the circuit court's order, arguing that the court had improperly made a factual finding on a motion for partial summary judgment. The circuit court denied defendants' motion.

Prior to the December 1991 trial date, defendants filed several motions in limine to preclude or limit plaintiffs from introducing evidence of child-rearing costs and to prevent Sorrell from signing, correcting, or changing the transcript of her deposition taken in August 1991. The trial court denied these motions.

Jury trial commenced on December 9, 1991. During the trial, the trial court entered an order granting defendants' motion for a directed verdict on the breach of warranty claim, disposing of count II of plaintiffs' complaint, and denying all oral motions for directed verdicts made in open court on the remaining claims.

On December 17, 1991, the jury returned a verdict in favor of plaintiffs, awarding them $75,000.00 in general damages on count III (lack of informed consent) only. Judgment was entered accordingly.

Post trial, defendants filed a motion for a JNOV, or, in the alternative, for a new trial. After a hearing on the matter, the trial court granted .defendants' motion for a JNOV because the jury instructions had stated that "the plaintiff must prove liability and legal cause based on medical expert evidence," noting that it had heard "no medical evidence presented by the plaintiff Robin Carr at all."

In addition, the trial court alternatively granted defendants' motion for a new trial "based upon differences or irreconcilable differences" in the jury's answers on the special verdict form. The trial court again noted that "there [was] no medical evidence submitted by the plaintiff, one way or the other, to prove his theory plus tie it in as a legal cause for the injuries suffered by the plaintiff." Following the trial court's entry of its written order, these timely appeals were filed.

## II. DISCUSSION

### A. Plaintiffs' Appeal

As previously indicated, the trial court granted defendants' motion for a JNOV because plaintiffs presented "no medical evidence ... at all." We thus first consider whether Hawai'i's informed consent doctrine requires a plaintiff to provide expert medical evidence in support of a claim for a physician's failure to disclose the risks of harm prior to treatment.

### 1. Hawai'i's Doctrine of Informed Consent and the Expert Medical Testimony Requirement

In *Nishi v. Hartwell*, 52 Haw. 188, 191, 473 P.2d 116, 119 (1970), this court acknowledged a common law cause of action for a physician's negligent failure "to disclose to [his or her] patient all relevant information concerning a proposed treatment, including the collateral hazards attendant thereto." In *Nishi*, the plaintiff (Nishi), sought to recover damages for injuries he suffered that allegedly resulted from his undergoing a thoracic aortography, a diagnostic surgical procedure used to detect aneurysms. The procedure was recommended and performed by the defendant-physicians.

In *Nishi*, we initially noted that: (1) the complaint framed the action as one sounding in battery, for the defendants' unlawful touching of Nishi without his consent; (2) battery, however, was inapplicable to the case because Nishi had consented to defendants' touching; and (3) pursuant to Hawai'i Rules of Civil Procedure Rule 15(b), because the right of a plaintiff to relief does not depend on his or her allegations or his or her theory of the case, we treated the action as one sounding in negligence, explicitly recognizing and adopting the tort cause of action based on a physician's breach of his or her duty to disclose to his or her patient all relevant information concerning a proposed treatment, which reflected a growing nationwide trend. *Id.* at 190–91, 473 P.2d at 118–19.

**480**

Despite our acknowledgment of the doctrine of informed consent, we nevertheless affirmed the trial court's dismissal of Nishi's complaint for two alternative reasons. First, the defendant-physicians' alleged failure to disclose the collateral risk of the thoracic aortography procedure that injured Nishi was justified by the therapeutic privilege exception to the physician's duty to disclose risk information. This exception recognizes that, under some circumstances, disclosure of certain risks would not be in the patient's best medical interests. Undisputed testimony was presented at trial that Nishi was apprehensive about his heart and circulatory system problems and that disclosure of information may have exacerbated his condition. *Id.* at 193, 473 P.2d at 120.

Second, and most importantly for the present case, under the "physician-oriented" or "professional" standard of disclosure, Nishi bore the burden to produce expert medical testimony "to establish a medical standard from which the jury could find that defendants deviated from their duty [of disclosure] to [the plaintiff]." *Id.* at 196, 473 P.2d at 121. We noted:

> In determining the question of [a] physician's liability for nondisclosure courts generally follow the rule applicable to medical malpractice actions predicated on alleged negligence in treatment which requires the question of negligence to be decided *by reference to relevant medical standards and imposes on the plaintiff the burden of proving the applicable standard by expert medical testimony.*

*Id.* at 195, 473 P.2d at 121 (emphasis added) (citations omitted). Because Nishi had failed to adduce expert medical testimony regarding what physicians in the community disclosed to their patients regarding the particular medical procedure, we affirmed the trial court's dismissal of Nishi's complaint, and by so holding, adopted the "physician-oriented" standard of disclosure for actions based on the doctrine of informed consent.

Two years later, however, the United States Court of Appeals for the District of Columbia Circuit decided the seminal case of *Canterbury v. Spence,* 464 F.2d 772, *reh'g denied,* 464 F.2d 772 (D.C.Cir.), *cert. denied,*

409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972), and spearheaded what has become known as the "patient-oriented" standard of disclosure for actions founded on the doctrine of informed consent. Agreeing that "the physician's noncompliance with a professional custom to reveal, like any other departure from prevailing medical practice, may give rise to liability to the patient," the *Canterbury* court nevertheless disagreed with the then-prevailing view that the patient's cause of action is "dependent upon the existence and nonperformance of a relevant professional tradition." *Id.* at 783. The court, in expressing its concerns with the physician-oriented standard, stated:

> There are, in our view, formidable obstacles to acceptance of the notion that the physician's obligation to disclose is either germinated or limited by medical practice. To begin with, the reality of any discernible custom reflecting a professional concensus on communication of option and risk information to patients is open to serious doubt. We sense the danger that what in fact is no custom at all may be taken as an affirmative custom to maintain silence, and that physician-witnesses to the so-called custom may state merely their personal opinions as to what they or others would do under given conditions. We cannot gloss over the inconsistency between reliance on a general practice respecting divulgence and, on the other hand, realization that the myriad of variables among patients makes each case so different that its omission can rationally be justified only by the effect of its individual circumstances. Nor can we ignore the fact that to bind the disclosure obligation to medical usage is to arrogate the decision on revelation to the physician alone. Respect for the patient's right of self-determination on particular therapy demands a standard set by law for physicians rather than one which physicians may or may not impose upon themselves.

*Id.* at 783–84. Thus, dissatisfied with the physician-oriented standard and acknowledging that the patient's right of self-determination regarding submission to a particular medical procedure "can be effectively ex-

ercised only if the patient possesses enough information to enable an intelligent choice," *id.* at 786, the *Canterbury* court concluded that "the scope of the physician's communications to the patient . . . must be measured by the patient's need, and that need is the information *material* to the decision." *Id.* (emphasis added). Therefore, the test for determining "whether a particular peril must be divulged is its materiality to the patient's decision: all risks potentially affecting the [patient's] decision must be unmasked." *Id.* at 786–87.

The *Canterbury* court was quick to note, however, that the central inquiry of "materiality" was to be judged by an objective standard:

> The scope of the standard is not subjective as to either the physician or the patient; it remains objective with due regard for the patient's informational needs and with suitable leeway for the physician's situation. In broad outline, we agree that a risk is thus material when a reasonable person, in which the physician knows or should know to be the patient's position, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed therapy.

*Id.* at 787 (internal footnote and quotation marks omitted). In this context, many considerations factor into the factfinder's determination of materiality:

> The topics importantly demanding a communication of information are the inherent and potential hazards of the proposed treatment, the alternatives to that treatment, if any, and the results likely [to be expected] if the patient remains untreated. The factors contributing significance to the dangerousness of a medical technique are, of course, the incidence of injury and the degree of the harm threatened. A very small chance of death or serious disablement may well be significant; a potential disability which dramatically outweighs the potential benefit of the therapy or the detriments of the existing malady may summon discussion with the patient.
>
> There is no bright line separating the significant from the insignificant; the an-

swer in any case must abide a rule of reason. Some dangers—infection, for example—are inherent in any operation; there is no obligation to communicate those of which persons of average sophistication are aware. Even more clearly, the physician bears no responsibility for discussion of hazards the patient has already discovered, or those having no apparent materiality to patients' decision on therapy. The disclosure doctrine, like others marking lines between permissible and impermissible behavior in medical practice, is in essence a requirement of conduct prudent under the circumstances. Whenever nondisclosure of particular risk information is open to debate by reasonable-minded [persons], the issue is for the finder of the facts.

*Id.* at 787–88.

Following *Canterbury,* the Hawai'i legislature in 1976 enacted HRS chapter 671, which deals with medical torts, and codified the tort of a physician's negligent failure to disclose risk information prior to treatment. The statute was subsequently amended in 1983. Today, HRS § 671–3 (1985) deals specifically with informed consent and provides in pertinent part:

**Informed consent; board of medical examiners standards.**

(a) The board of medical examiners, insofar as practicable, shall establish standards for health care providers to follow in giving information to a patient, or to a patient's guardian if the patient is not competent to give an informed consent, to insure that the patient's consent to treatment is an informed consent. The standards may include the substantive content of the information to be given, the manner in which the information is to be given by the health care provider and the manner in which consent is to be given by the patient or the patient's guardian.

(b) If the standards established by the board of medical examiners include provisions which are designed to reasonably inform a patient, or a patient's guardian, of:

(1) The condition being treated;

(2) The nature and character of the proposed treatment or surgical procedure;

(3) The anticipated results;

(4) The recognized possible alternative forms of treatment; and

(5) The recognized serious possible risks, complications, and anticipated benefits involved in the treatment or surgical procedure, and in the recognized possible alternative forms of treatment, including non-treatment,

then the standards shall be admissible as evidence of the standard of care of the health care providers.

(Bold in original.)

Recognizing *Canterbury*'s innovations in the doctrine of informed consent and faced with the question of the effect of HRS chapter 671 on Hawai'i's doctrine of informed consent, the Intermediate Court of Appeals (ICA) in *Leyson v. Steuermann*, 5 Haw.App. 504, 705 P.2d 37 (1985), closely examined our decision in *Nishi* and questioned the continued viability of *Nishi*'s pronouncements regarding a physician's duty to disclose risk information regarding proposed medical treatment. In *Leyson*, the ICA suggested that *Nishi*'s descriptions of the doctrine "appear to be contradictory," noting that the *Nishi* opinion "initially describes the doctrine as a precise and definite duty but then it alternatively describes the doctrine as a duty to comply with relevant medical standards." *Id.* at 513, 705 P.2d at 44.

Citing *Canterbury*, the *Leyson* court noted that the portion of *Nishi* that imposed on the plaintiff the burden of proving the applicable standard by expert medical testimony

> fails to recognize that "[e]very human being of adult years and sound mind has a right to determine what shall be done with his [or her] own body," and that what the medical profession thinks their patients should be told is not necessarily what their patients would find significant in making their informed choices.

*Id.* at 513, 705 P.2d at 44–45 (brackets in original) (quoting *Schloendorff v. Society of New York Hospital*, 211 N.Y. 125, 129, 105 N.E. 92, 93 (1914)). However, despite the ICA's discomfort over the state of the law and, although the plaintiffs in *Leyson* had submitted jury instructions couched in the patient-oriented viewpoint, the *Leyson* court did not reach the issue whether the physician- or patient-oriented standard governed the physician's duty of disclosure in Hawai'i, because the plaintiffs in *Leyson* had agreed to the presentation of the defendant's proposed instruction regarding the standard of disclosure.

Moreover, the ICA noted that the duty to disclose, as prescribed by HRS § 671–3 and as delineated in our opinion in *Nishi*, were in conflict—where *Nishi* mandates a duty to disclose "all collateral hazards," HRS § 671–3 requires a physician to disclose "the probable risks and effects of the proposed treatment or surgical procedure." [4] Although the ICA noted that "[i]t is not clear from the language or history of chapter 671 whether the legislature's intent was to supplant *Nishi*'s ambiguously defined duty of disclosure," it nevertheless identified five material elements of the tort of a physician's negligent

---

4. Inasmuch as *Leyson* dealt with injuries resulting prior to 1983, the ICA discussed the 1976 version of HRS § 671–3, which provided in relevant part:

(b) The board of medical examiners shall, insofar as practicable, establish reasonable standards of medical practice, applicable to specific treatment and surgical procedures, for the substantive content of the information required to be given and the manner in which it is given and in which consent is received in order to constitute informed consent from a patient or a patient's guardian. The standards shall include provisions which are designed to reasonably inform and to be understandable by a patient or a patient's guardian of *the probable risks and effects of the proposed treatment or surgical procedure, and of the probable risks of not receiving the proposed treatment or surgical procedure.* The standards established by the board shall be prima facie evidence of the standards of care required but may be rebutted by either party.

(Emphasis added.)

As previously noted, the requisite standard was amended in 1983 to require a physician to disclose "the recognized serious possible risks, complications and anticipated benefits involved in the treatment or surgical procedure, and in the recognized possible alternative forms of treatment, including non-treatment."

failure to disclose the risks of harm prior to treatment: (1) the physician owed a duty to disclose to the patient prior to treatment the risk of the harm suffered by the patient; (2) the physician negligently performed or failed to perform his [or her] duty of disclosure; (3) the patient suffered the harm; (4) the physician's negligent performance or nonperformance of duty was the [legal] cause of the patient's harm in that (a) the physician's treatment was a substantial factor in bringing about the patient's harm, and (b) the patient, acting rationally and reasonably, would not have undergone the treatment had he or she been properly informed of the risk of the harm that in fact occurred; and (5) no other cause is a superseding cause. *See* *Leyson*, 5 Haw.App. at 516–17, 705 P.2d at 47.

Two years later, in *Mroczkowski v. Straub Clinic & Hospital, Inc.*, 6 Haw.App. 563, 732 P.2d 1255 (1987), the ICA revisited the informed consent doctrine and explicitly held that HRS chapter 671 "modified the description of the general standards of required disclosures announced in *Nishi*." *Id.* at 567, 732 P.2d at 1258. The ICA explained:

> Act 219[, § 2, 1976 Haw.Sess.Laws 523–24] (1976) directed the board of medical examiners (board) to specifically itemize the probable risks and effects of each specific treatment or surgical procedure. It made the resulting specific itemizations, if any, prima facie evidence of what the physician was required to disclose to the patient before obtaining the patient's informed consent.
>
> Act 223[, § 1, 1983 Haw.Sess.Laws 468–69] (1983) asked the board to establish specific standards for health care providers to follow in disclosing information to a patient before obtaining the patient's informed consent. It made the board's specific standards, if any, admissible as evidence of the required specific standards of care only if the board's specific standards are designed to reasonably inform the patient of, *inter alia*, the recognized serious possible risks and complications of each specific treatment or surgical procedure.
>
> *Since under both Acts 219 and 223 the board's specifically itemized components of the statutory general standard are relevant evidence of the applicable general standard, it necessarily follows that the statutory general standard is the applicable general standard.*

*Id.* at 567, 732 P.2d at 1258 (emphasis added). Because Mroczkowski was injured in 1980, the ICA applied the 1976 statutory standard. In so doing, the ICA held that, had the Board of Medical Examiners developed the specifically itemized components of the statutory general standard, as contemplated by HRS § 671–3(b) (1976), Mroczkowski would have been required to prove the specific components because, as stated in the statute, the board's itemization would have been prima facie evidence of the specific information required to be given. Due to the overwhelming amount of medical and surgical procedures, however, the board did not comply with HRS § 671–3(b), and the ICA accordingly held that "Mroczkowski was therefore required to prove *by proper evidence* that the harm he is complaining about was a probable risk...." *Id.* at 568, 732 P.2d at 1259 (emphasis added). The ICA, however, did not further elucidate as to what would constitute "proper evidence," and, moreover, explicitly declined, in a footnote, to answer the question whether the "seriousness" of the risk as delineated in the 1983 amendments to HRS § 671–3 was "to be answered from the point of view of the patient, the physician, or otherwise." *Id.* at 567–68 n. 1, 732 P.2d at 1259, n. 1.

Subsequently, in *Keomaka v. Zakaib*, 8 Haw.App. 518, 811 P.2d 478, *cert. denied*, 72 Haw. 618, 841 P.2d 1075 (1991), the ICA explicitly held that the statutory standard set out in HRS § 671–3(b) would govern the physician's duty of disclosure and noted that "a physician or surgeon has a duty to reasonably inform his [or her] patient regarding those items specified in HRS § 671–3(b) as to the proposed treatment or surgical procedure in order to obtain an informed consent from his [or her] patient." *Id.* at 524, 811 P.2d at 482–83. The *Keomaka* court did not, however, address the issue whether the statutory factors were to be viewed from the viewpoint of the physician or the patient.

Finally, in *Bernard v. Char*, 79 Hawai'i 371, 903 P.2d 676 (Haw.App.1995), *cert. granted*, 78 Hawai'i 474, 896 P.2d 930 (1995), the ICA explicitly addressed the issue whether the physician's duty of disclosure, in the dental context, would be assessed from the viewpoint of the physician or the patient. In *Bernard*, the ICA reiterated the physician's duty to disclose risk information as phrased in *Nishi* that a physician owes a duty to disclose "all relevant information concerning a proposed treatment, including the collateral hazards attendant thereto, so that the patient's consent to the treatment would be an intelligent one based on complete information." *Bernard*, 79 Hawai'i at 382, 903 P.2d at 687. Citing "growing acceptance in recent years" for the patient-oriented standard across the nation, the ICA held that, "[b]ecause the focus of this duty is on what information a patient needs in order to make an intelligent decision regarding a course of treatment, we conclude that the patient standard applies." *Id.*, 79 Hawai'i at 382, 903 P.2d at 687. The ICA went on to explain:

> Under the patient standard, expert testimony is not critical to demonstrate the amount of information a patient needs in order to intelligently decide between two treatment options. The decision as to what procedure to undergo is ultimately the patient's; to impose a standard of disclosure dictated by experts would be to undermine the decision-making power of patients in similar situations. Therefore, in proving the element of duty for informed consent purposes, a patient *is not required to produce any expert medical testimony* regarding what other reasonable dentists would have disclosed under the same or similar circumstances.

*Id.* (emphasis added.) The *Bernard* court cautioned, however, that the adoption of the patient standard "should not be construed to mean that expert [medical] testimony may be dispensed with entirely in informed consent cases," *id.*, 79 Hawai'i at 383, 903 P.2d at 688, and noted that "[e]xpert testimony will still be required to establish the nature of risks inherent in a particular treatment, the probabilities of therapeutic success, the frequency of the occurrence of particular risks, and the nature of available alternatives to treat-

ment." *Id.* (internal quotation marks, internal brackets, and citation omitted).

However, the *Bernard* court did note that, regarding the therapeutic privilege exception, pursuant to *Nishi*, the physician-oriented standard applied because a physician's nondisclosure of risk information pursuant to the therapeutic privilege exception would be based on the physician's exercise of his or her professional judgment. *Id.*, 79 Hawai'i at 381–82, 903 P.2d at 686–87. As noted in *Nishi*, a defendant doctor's testimony may, in appropriate circumstances, satisfy the expert testimony requirement pursuant to the physician-oriented standard.

## 2. The Patient–Oriented Standard Governs the Physician's Duty to Disclose Risk Information Prior to Treatment

Ideally, and in the abstract, the physician-oriented standard—*i.e.*, what a reasonable physician believes should be disclosed to a patient prior to treatment in order for the patient to make an informed and intelligent decision regarding a course of treatment or surgery—and the patient-oriented standard—*i.e.*, what a reasonable patient needs to hear from his or her physician in order to make an informed and intelligent decision regarding treatment or surgery—would dictate the same scope of disclosure, barring the applicability of any of the exceptions to a physician's duty to disclose. We must assume, for purposes of fashioning a prospective rule, that physicians seek to provide their patients with the same amount and quality of risk information prior to treatment that the patient would need to hear in order to make an informed and intelligent choice. Both standards, therefore, tempered by objectivity, seek to achieve the same goal, that is, to insure that the patient's decision to undergo a particular medical procedure is an informed and intelligent decision.

The dispositive issue, therefore, is one of proof; in other words, which party's viewpoint should dictate the standard against which the conduct in issue should be judged? The *Bernard* court provided the following rationale:

Courts which apply [the patient-oriented] standard emphasize what the patient needs to know to make an informed decision, rather than what the medical community thinks the patient should be told.... [The patient-oriented] standard provides the patient with effective protection against a possible conspiracy of silence wherever it may exist among physicians. Moreover, since the patient must suffer the consequences, and since he or she bears all the expenses of the medical treatment, fundamental fairness requires that the patient be allowed to know what risks a proposed treatment entails, what the alternatives thereto are and the relative probabilities of success.

*Id.*, 79 Hawai'i at 381, 903 P.2d at 686 (internal quotation marks and citations omitted). Analogously, the *Canterbury* court reasoned as follows:

The duty to disclose ... arises from phenomena apart from medical custom and practice. The latter, we think, should no more establish the scope of the duty than its existence. Any definition of scope in terms purely of a professional standard is at odds with the patient's prerogative to decide on projected therapy himself [or herself]. That prerogative, we have said, is at the very foundation of the duty to disclose, and both the patient's right to know and the physician's correlative obligation to tell ... are diluted to the extent that its compass is dictated by the medical profession.

*Canterbury*, 464 F.2d at 786. We agree.

We believe that the patient-oriented standard of disclosure better respects the patient's right of self-determination and affixes the focus of the inquiry regarding the standard of disclosure on the motivating force and purpose of the doctrine of informed consent—aiding the individual patient in making an important decision regarding medical care. It also protects against the pitfalls of proof associated with the physician-oriented standard discussed in *Canterbury*. Moreover, not only should the patient's decision remain at the forefront when assessing the physician's disclosure to his or her patient in each case, but we also believe that, barring situations where the therapeutic privilege exception to the physician's duty to disclose is applicable, what the *medical community* believes the patient needs to hear in order for the patient to make an informed decision is insufficient, without more, to resolve the question of what an *individual patient* reasonably needs to hear in order for that patient to make an informed and intelligent choice regarding the proposed medical treatment.

Therefore, in view of: (1) the fact that *Nishi* was decided without the benefit of the *Canterbury* decision; (2) the codification of Hawai'i's doctrine of informed consent; and (3) the growing nationwide trend favoring the patient-oriented standard, *see generally* Annotation, *Modern Status of Views As to General Measure of Physician's Duty to Inform Patient of Risks of Proposed Treatment*, 88 A.L.R.3d 1008, §§ 3, 6–7 (1979 and Supp. 1995), we agree with the ICA's application of the patient-oriented standard to the physician's duty to disclose risk information prior to treatment in *Bernard*.[5] We therefore expressly adopt the patient-oriented standard applicable to a physician's duty to disclose risk information prior to treatment, and, to the extent that *Nishi* may be construed otherwise, it is overruled.[6]

5. Although *Bernard* dealt with informed consent in the dental context, and HRS § 671–3(b) arguably does not apply, *see* HRS § 671–1(1) (defining "health care provider" as "a physician or surgeon licensed under chapter 453, a physician or a physician and surgeon licensed under chapter 460, and health care facility as defined in section 323D–2, and the employees of any of them"), our adoption of the patient-oriented standard applies generally to the common law doctrine of informed consent and to all professionals within its purview.

6. Recently, in *Craft v. Peebles*, 78 Hawai'i 287, 893 P.2d 138 (1995), we relied on *Nishi* for the general proposition that "the question of *negligence* must be decided by reference to relevant medical standards of care for which the plaintiff carries the burden of proving through expert medical testimony." *Id.* at 298, 893 P.2d at 149. It is clear that the standard of care for a claim based on allegedly negligent medical *treatment* must be established by reference to prevailing standards of conduct in the applicable medical community and must be so proved by expert medical testimony because, as noted in *Craft*, "a

The dispositive inquiry regarding the physician's duty to disclose in an informed consent case, therefore, is not what the physician believes his or her patient needs to hear in order for the patient to make an informed and intelligent decision; the focus should be on what a reasonable person objectively needs to hear from his or her physician to allow the patient to make an informed and intelligent decision regarding proposed medical treatment.

 We strongly caution, however, as did the ICA in *Bernard,* that our adoption of the patient-oriented standard does not relieve plaintiffs of their burden to provide expert medical testimony as to the "materiality" of the risk; to the contrary, a plaintiff maintains the burden of adducing expert medical testimony to establish "the nature of risks inherent in a particular treatment, the probabilities of therapeutic success, the frequency of the occurrence of particular risks, and the nature of available alternatives to treatment." *Bernard,* 79 Hawai'i at 383, 903 P.2d at 688 (quotation marks, internal brackets, and citation omitted). As the *Canterbury* court noted:

> Experts are ordinarily indispensable to identify and elucidate for the factfinder the risks of therapy and the consequences of leaving existing maladies untreated. They are normally needed on issues as to the cause of any injury or disability suffered by the patient and, where privileges are asserted, as to the existence of any emergency claimed and the nature and seriousness of any impact upon the patient from risk-disclosure. Save for relative[ly] infre-

quent instances where questions of this type are resolvable wholly within the realm of ordinary human knowledge and experience, the need for the expert is clear.

464 F.2d at 791–92 (footnote omitted).

Therefore, the net prospective effect of our holding today is that a plaintiff's case will not fail for lack of expert medical testimony regarding the prevailing standard of disclosure in the medical community for a particular medical procedure or treatment.[7]

### 3. Defendants' Motion for a JNOV

#### a. *Standard of Review*

It is well settled that

> denials of directed verdict or JNOV motions [are reviewed] *de novo.* Verdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the jury's findings. We have defined "substantial evidence" as credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion.
>
> In deciding a motion for directed verdict or JNOV, the evidence and the inferences which may be fairly drawn therefrom must be considered in the light most favorable to the nonmoving party and either motion may be granted only where there can be but one reasonable conclusion as to the proper judgment.

*Richardson v. Sport Shinko (Waikiki Corp.),* 76 Hawai'i 494, 503, 880 P.2d 169, 178 (1994) (internal citations and some quotation marks

jury generally lacks the requisite special knowledge, technical training, and background to be able to determine the applicable standard without the assistance of an expert." *Id.* The standard of *disclosure* of material risks prior to treatment, however, as we have discussed above, is capable of determination under the patient-oriented standard without reference to prevailing medical standards or medical judgment, although such evidence may, subject to a Hawai'i Rule of Evidence 403 balancing, be relevant and admissible. To the extent that *Nishi* stands for the proposition stated in *Craft, Nishi* remains an accurate statement of the law.

7. In *Craft, supra,* we affirmed the trial court's reading of a jury instruction that provided that a plaintiff who brings "an action based on in-

formed consent must establish the applicable standard of care through expert medical testimony [and] manufacturer's package inserts do not, by themselves, set the standard of care which is applicable to a physician on the issue of informed consent[.]" *Craft,* 78 Hawai'i at 306, 893 P.2d at 157. As previously noted, expert medical testimony is generally required to establish the "materiality" and/or the magnitude of the risk of harm that in fact occurs. The instruction in *Craft* is therefore accurate to the extent that it requires expert medical testimony to establish "materiality." However, the opinion in *Craft* should not be interpreted to require expert medical testimony to establish the standard of disclosure.

omitted; brackets in original); *see also Guaschino v. Eucalyptus, Inc.*, 3 Haw.App. 632, 643, 658 P.2d 888, 896 (1983) ("Where there is conflicting evidence, or there is insufficient evidence to make a 'one-way' verdict proper, [JNOV] should not be awarded." (quoting 5A J. Moore & J. Lucas, Moore's Federal Practice, ¶ 50.07[2] (2d ed. 1982))).

### b. *Expert Medical Testimony*

Defendants argue that, because plaintiffs failed to establish their claim based on lack of informed consent through expert medical testimony, the trial court properly granted their motion for a JNOV. Plaintiffs retort by asserting that they met their evidentiary burden as to the standard of disclosure through Dr. Strode's testimony. We agree with plaintiffs, but for different reasons.

■ As previously discussed, a plaintiff is not required to prove the standard of disclosure required for informed consent with medical expert evidence, but is required to prove by expert medical evidence the materiality of the risk of harm to which the plaintiff was subjected. It is clear that a defendant-physician's testimony may satisfy this burden. *See Nishi*, 52 Haw. at 196–97, 473 P.2d at 121 (defendant-doctor's testimony sufficient to meet expert medical evidence burden required to prove an informed consent claim).

■ Dr. Strode testified that urologists performing vasectomies must comply with the specific informed consent standards set forth in the Rules of the Board of Medical Examiners, which are identical to those in HRS § 671–3(b). The specific standards include a requirement to disclose "[t]he recognized serious possible risks, complications, and anticipated benefits[.]" 85 Rules of the Board of Medical Examiners § 16–85–25.

Further, Dr. Strode described recanalization[8] as "a complication" and a "faintly possible" risk. Because recanalization occurs in less than one percent of vasectomy patients, Dr. Strode believed that "most urologists feel the incident of recanalization is so infrequent, so rare, that it's not necessary to specifically mention or select recanalization as a serious risk to a patient requesting a vasectomy."[9]

However, Dr. Strode testified that "a urologist is required, in the general setting of informed consent, to indicate to the patient that the procedure is not guaranteed to succeed." Dr. Strode explained that "medicine is not an exact science and no procedure can be guaranteed, of any kind, vasectomy included." Although indicating a requirement to disclose that a procedure was "not guaranteed," Dr. Strode also stated that the exact wording was a matter within the urologist's discretion. Based on Dr. Strode's testimony, we hold that plaintiffs met their burden of establishing the materiality of the risk of the vasectomy failing through the defendant-physician's expert medical testimony.

### c. *Causation*

■ As previously noted, in an informed consent case, a plaintiff must prove, *inter alia* and within reasonable medical probability, that the physician's negligence was the legal cause of the patient's harm in that: "(a) the physician's treatment was a substantial factor in bringing about the patient's harm and (b) the patient, acting rationally and reasonably, would not have undergone the treatment had he or she been properly informed of the risk of the harm that in fact occurred[.]" *Keomaka*, 8 Haw.App. at 524–25, 811 P.2d at 483 (citing *Mroczkowski*, 6 Haw.App. at 566, 732 P.2d at 1257).

■ Defendants argue that the trial court properly granted their motion for a JNOV because plaintiffs failed to establish that Dr. Strode's alleged non-disclosure was a substantial factor in causing their alleged harm

---

8. According to Dr. Strode, vasectomy "recanalizations" occur when one or both of the two vas deferens tubes become reconnected.

9. Carr testified at trial that Dr. Strode "really expressed to [him] that once [he] had this [vasectomy] operation, then, that [he] was going to be sterile for the rest of [his] life." When asked if Dr. Strode said anything about guarantees, however, Carr answered, "not that I recall."

Sorrell testified at trial that "Dr. Strode informed us that the operation was indeed permanent in nature and that once my husband was sterilized, had, the vasectomy, upon notification that there was no more sperm present in his semen, that he will be indeed sterile."

in that plaintiffs failed to prove that Carr was Ellen's natural father. Plaintiffs typically would have the burden of providing expert medical evidence concerning Ellen's paternity; however, in the present case, plaintiffs had the benefit of the statutory presumption contained in HRS chapter 584, the Uniform Parentage Act.

Pursuant to HRS § 584-4(a)(1) (1985), a man is presumed to be the natural father of a child if "[h]e and the child's natural mother are or have been married to each other and the child is born during the marriage[.]" The presumption may be rebutted only by "clear and convincing evidence." *Id.* Ellen was born during Carr and Sorrell's marriage; thus, the presumption applies in this case. Because defendants failed to rebut the presumption that Carr was Ellen's father by clear and convincing evidence, we hold that the unrebutted presumption carried plaintiff's burden of proving that Dr. Strode's performance of the vasectomy on Carr was a substantial factor in causing Ellen's unplanned birth.

Regarding part (b) of the causation requirement, defendants claim that plaintiffs failed to carry their burden, which required proof that "[Carr], acting rationally and reasonably, would not have undergone the treatment had he ... been properly informed of the risk of the harm that in fact occurred." Defendants assert that, in spite of the inherent risks, Carr would have undergone the first vasectomy because he underwent the second vasectomy, notwithstanding Dr. Simich's warning that the second vasectomy was not guaranteed to succeed and his wife's concern about the failure rates associated with the procedure.

Sorrell testified at trial that, prior to the time Carr and Sorrell decided that Carr would undergo the first vasectomy procedure, Sorrell did some research regarding the failure rates associated with the various contraceptive options, including vasectomies, in medical books, pamphlets, and other "medical type material." However, Sorrell claims that whatever information she gleaned from those sources was never relayed to her husband.

Carr claims that Dr. Simich did not give him any information about the risk of failure or the lack of guarantees. Carr further indicated that he would not have undergone the first vasectomy procedure if he had known that it might fail or allow him to become fertile in the future.

Defendants also claim that Carr and Sorrell would have accepted the risks involved with a vasectomy because they have not relied on other forms of contraception since the second vasectomy. However, the evidence is unclear as to whether Carr and Sorrell in fact used other forms of contraception after the second vasectomy. Our review of the record indicates that the evidence is in conflict and cannot be viewed as supporting a "one-way" determination that Carr would have undergone the first vasectomy procedure even if properly informed of the risks. Thus, we hold that the trial court erred in granting defendant's motion for a JNOV on the issue of legal causation.

### 4. Motion for New Trial

#### a. *Standard of Review*

■ Both the grant and the denial of a motion for new trial is within the trial court's discretion, and we will not reverse that decision absent a clear abuse of discretion. *Richardson,* 76 Hawai'i at 503, 880 P.2d at 178; *see also Stahl v. Balsara,* 60 Haw. 144, 152, 587 P.2d 1210, 1215 (1978). An abuse of discretion occurs "where the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 114, 839 P.2d 10, 26, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992). Unlike motions for a directed verdict or a JNOV, the movant need not, on a motion for new trial, convince the court to rule that no substantial evidence supports its opponent's case, but only that the verdict rendered for its opponent is against the manifest weight of the evidence. *Richardson,* 76 Hawai'i at 503, 880 P.2d at 178.

b. *The Jury's Answers to the Interrogatories on the Special Verdict Form Are Not Irreconcilably Inconsistent*

The trial court conditionally granted defendants a new trial because of: (1) purported "irreconcilable differences" in the jury's answers to questions one and three in the special verdict form; and (2) Carr's purported failure to submit any medical expert evidence "to prove his theory plus tie it in as a legal cause for injuries suffered." Because we have held that plaintiffs provided sufficient medical evidence to prove that Dr. Strode breached his duty to obtain informed consent and that the breach was a legal cause of the pregnancy, we need not address the second point.

As to the first point, we note that, on question 1 of the special verdict form, the jury found that Dr. Strode *negligently failed to obtain Carr's informed consent* to the vasectomy procedure performed on December 9, 1985. On question 3, the jury found that Dr. Strode did not *negligently misrepresent any material facts* to plaintiffs concerning the vasectomy procedure.

■■■ A conflict in the jury's answers to questions in a special verdict will warrant a new trial only if those answers are irreconcilably inconsistent, and the verdict will not be disturbed if the answers can be reconciled under any theory. *Craft*, 78 Hawai'i at 307, 893 P.2d at 158 (quotation marks and citations omitted). The theory, however, must be supported by the trial court's instructions to the jury. *See Toner v. Lederle Laboratories*, 828 F.2d 510, 512 (9th Cir.1987), ("When faced with a claim that verdicts are inconsistent, the court must search for a reasonable way to read the verdicts as expressing a coherent view of the case, and must exhaust this effort before it is free to dismiss the jury's verdict and remand the case for a new trial. The consistency of the jury verdicts must be considered in light of the judge's instructions to the jury." (citations omitted)), *cert. denied*, 485 U.S. 942, 108 S.Ct. 1122, 99 L.Ed.2d 282 (1988).

■■■ One of the trial court's instructions to the jury on the *negligent misrepresentation* claim required plaintiffs to demonstrate that Dr. Strode had provided them with false information.[10] Conversely, the instructions on the *informed consent* claim did not so require.[11] The jury therefore certainly could

10. Plaintiffs' requested instruction No. 11, given over objection by defendants, provided in pertinent part:

One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary/monetary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information. If you find from the evidence that the physician supplied false information for the guidance of Plaintiffs in the vasectomy procedure, that Plaintiffs justifiably relied upon that information in agreeing to the vasectomy procedure and that Defendants failed to exercise reasonable care or competence in obtaining or communicating the information, you may find the Defendants liable to the Plaintiffs for any damages which you find are necessary to compensate the Plaintiffs for the pecuniary loss to them of which the misrepresentation is a substantial factor.

The trial court also gave another negligent misrepresentation instruction, proffered by defendants, which did not include a false-information requirement. However, based on the above-quoted instruction, the jury could have found that Dr. Strode's discussions with plaintiffs were truthful but incomplete.

11. Plaintiffs' requested instruction No. 10, dealing with informed consent, given as modified by agreement, was read to the jury as follows:

A physician or surgeon has a duty to reasonably inform his or her patient of all of the following as to the proposed treatment or surgical procedure in order that the necessary consent to treatment or surgery be based on an intelligent exercise of the judgment of the person consenting to the treatment or surgery.
1. The condition being treated;
2. The nature and character of the proposed treatment or surgical procedure;
3. The anticipated results;
4. The recognized possible alternative forms of treatment; and,
5. The recognized serious possible risks, complications, and anticipated benefits involved in the treatment or surgical procedure, and in the recognized possible alternative forms of treatment, including non-treatment.
The specific information which must be provided by a physician regarding each of the

have found that, even though the information provided to plaintiffs by Dr. Strode was not false, it was nevertheless insufficient to secure Carr's informed consent. The jury thus had a sound basis under the theories of liability as presented by the jury instructions for finding defendants liable on the informed consent claim.

Accordingly, we hold that, in view of the jury instructions,[12] the jury's answers to the interrogatories on the special verdict forms were not irreconcilably inconsistent. Consequently, we reverse the trial court's order conditionally granting defendants a new trial based on inconsistent answers on the special verdict forms.

## B. Defendants' Cross–Appeal

Much of defendants' cross-appeal is moot because "the question[s] to be determined [are] abstract and [do] not rest on existing facts or rights." *In re Application of J.T. Thomas,* 73 Haw. 223, 226, 832 P.2d 253, 254 (1992). Defendants argue that the trial court erred in denying their motion for partial summary judgment regarding plaintiffs' claim for child-rearing costs. Defendants also contend that the court erred in denying their motion in limine to preclude plaintiffs from introducing evidence regarding such costs.

However, the issue of child-rearing costs raised in the motions for summary judgment and in limine are moot because the jury did not award any amount for special damages.[13] Defendants also contend that the trial court erred in giving plaintiffs' requested instruction No. 11, *see supra* note 10, regarding the claim of negligent misrepresentation. However, this issue is also moot because the jury ruled against plaintiffs on the negligent misrepresentation claim.

Therefore, only two viable issues remain in defendants' cross-appeal: (1) whether the trial court·erred in granting plaintiffs' motion for partial summary judgment requesting ·a factual finding that Dr. Strode did not use certain words regarding the risks of failure associated with a vasectomy; and (2) whether the trial court erred in denying defendants' motion to prevent Sorrell from changing her deposition after the deadline set forth by Hawai'i Rules of Civil Procedure (HRCP) Rule 30(c).

### 1. Plaintiffs' Motion for Partial Summary Judgment

Prior to trial, the court entered an "Order Regarding Plaintiffs' Motion for Partial Summary Judgment Filed on October 22, 1991," specifically finding that "prior to the vasectomy procedure [Dr. Strode] failed to specifically state to [Carr] that the vasectomy procedure might fail[,] and if such failure

---

above categories must be proven by Plaintiffs by medical expert evidence.

Defendants' requested instruction No. 13, dealing with informed consent, given as modified over objection by defendants, was read to the jury as follows:

In order to prove a right to recover based on Dr. Strode's alleged failure to obtain Plaintiff Robin R. Carr's informed consent prior to performing the vasectomy procedure on December 9, 1985, Plaintiffs must prove through expert medical evidence:

 (a) That Dr. Strode owed a duty to disclose to the patient the possibility that sterility achieved by the procedure might not be permanent;

 (b) That Dr. Strode negligently failed to so advise Robin R. Carr;

 (c) That the Plaintiff Robin Carr suffered harm;

 (d) That Dr. Strode's negligence was a cause of harm to Plaintiffs in that:

 1) Dr. Strode's treatment was a substantial factor in causing harm to Plaintiffs, and

 2) That Robin Carr, acting rationally and reasonably, would not have undergone the vasectomy had he been advised by Dr. Strode of the possibility that the sterility achieved by the procedure might not be permanent.

**12.** We note, however, that in view of: (1) our adoption, *supra,* of the "patient-oriented" standard of disclosure and its concomitant effects on the expert medical testimony requirement; and (2) our holding, *infra,* that the present case is remanded for a new trial on Dr. Strode's liability for failure to secure Carr's informed consent, the jury instructions on retrial should be tailored accordingly to reflect the changes in the applicable law we announce today.

**13.** The special verdict form provided in pertinent part:

 *Question 5.* If you find Plaintiffs are entitled to recover damages, indicate below the amount of such damage.

 Special Damages 0

 General Damages $75,000

were to occur that it would or could cause the plaintiff to remain fertile or become fertile again in the future." The court further stated that its order "[did] not limit any party's right to offer testimony concerning information provided to Carr prior to the procedure or the surrounding circumstances thereto at the trial."

At trial, after the close of the plaintiffs' case-in-chief, the court read the following statement to the jury:

> The [c]ourt has already determined that Doctor Strode and Straub Clinic and Hospital, properly performed and supervised a vasectomy procedure on December 9, 198[5], and thereafter provided proper follow-up, verification and care....

> The [c]ourt has already also determined that prior to the vasectomy procedure, defendant Walter S. Strode[,] M[.]D[.] *failed to specifically state to plaintiff, Robin Carr, that the vasectomy procedure might fail, and if such failure were to occur, that it would or could cause plaintiff, Robin Carr, to remain fertile or become fertile again in the future.*

> The [c]ourt, however, has not limited any parties' right to offer testimony concerning information provided to Mr. Carr prior to the procedure or the surrounding circumstances....

> The [c]ourt has not made any determination as to any duty owed by defendants to plaintiffs or that any duty owed was violated.

(Emphasis added.)

At the outset, we note that HRCP Rule 56(d) does not authorize the circuit court to make factual findings such as that sought by plaintiffs in their motion for partial summary judgment. HRCP Rule 56(d) provides:

> If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, *the court ... shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy[.] Upon the trial*

*of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.*

(Emphasis added). Plaintiffs' motion was "limited to the factual finding that Defendant Strode failed to inform the Plaintiffs of the risk of failure or a failure rate associated with a vasectomy operation and that Defendant Strode was required by law to make that disclosure."

HRCP Rule 56(d) is identical to its federal counterpart, and it is clear that the issue-narrowing provisions of Federal Rules of Civil Procedure (FRCP) Rule 56(d) "operates only in the wake of an unsuccessful (and proper) motion under Rule 56(a) or 56(b)." *Arado v. Gen. Fire Extinguisher Corp.,* 626 F.Supp. 506, 509 (N.D.Ill.1985) (citations omitted). Moreover, as Professor Moore notes:

> Certainly, while Rule 56 "contemplates summary judgment for a part or all of the claim made in a prayer of the claimant," it "does not contemplate summary judgments on evidentiary matters en route to that goal." Or, as the court stated in the *Yale Transport [v. Yellow Truck & Mfg. Co.]* case [3 F.R.D. 440, 441 (S.D.N.Y. 1944) ], Rule 56(d) "does not authorize the initiation of motions the sole subject of which is to adjudicate issues of fact which are not dispositive of any claim or part thereof." This objection may properly be achieved at a pretrial conference under Rule 16. The use of the pretrial procedure does, however, lie in the district court's discretion. A party should not, therefore, by an improper motion for summary judgment attempt to compel the district court to pre-try a case.

6A *Moore's Federal Practice,* § 56.20[3.–2] at 56–691 and 56–692 (footnotes omitted).

Professor Moore further notes that:

> *The court should not, however, make an order under Rule 56(d) eliminating for trial factual issues where the facts are in genuine controversy.* It should in due course proceed to a trial on the facts which remain in dispute. At the close of the trial on the disputed facts[,] it should make findings of facts and conclusions of law on the whole case, if the case is a court case

as distinguished from a jury case. If a case be a jury case[,] the disputed issue should, of course, be submitted to the jury under proper instructions.

*Id.* at 56–700 and 56–701 (emphasis added) (footnotes omitted).

First, pursuant to the *Arado* case, plaintiffs' motion improperly sought a factual determination wholesale, outside the context of a failed motion under HRCP Rule 56(a) or (b). Second, even if the motion was proper, defendants correctly argue that in the instant case, the circuit court erroneously made a finding concerning a material fact in substantial controversy. On appeal, we apply the same standard that the trial court used in ruling on a motion for summary judgment. *Amfac,* 74 Haw. at 104, 839 P.2d at 22.

Neither party disputes that the finding of the circuit court was a fact material to plaintiffs' informed consent claim. However, plaintiffs contend that the circuit court merely made a narrow factual finding that the evidence available to the court was not in substantial controversy. According to plaintiffs, the court expressly found only that Dr. Strode had not uttered certain specific words; that is, Dr. Strode did not specifically state to the plaintiffs that "the vasectomy procedure might fail, and if it does, Mr. Carr might either remain fertile or become fertile again." Plaintiffs contend that the circuit court, by so finding, did not necessarily rule that such words constituted any part of Dr. Strode's duty under the informed consent claim, or that Dr. Strode's "failure" to utter these words constituted a breach of that duty.

Defendants retort by asserting that, although Dr. Strode may not have uttered certain specific words, his discussions with plaintiffs prior to performing the vasectomy on Carr constituted a "statement" that the procedure might fail. Defendants claim that Dr. Strode informed Carr about the failure rates associated with vasectomies and told Carr that he could not guarantee his permanent sterility. Additionally, defendants note that Carr himself admitted that Dr. Strode informed him that the surgery had a ninety-nine percent success rate, which necessarily implies that Carr was made aware that the procedure had at least a one percent failure rate. Defendants therefore contend that the material fact found by the circuit court was actually in substantial controversy. We agree with defendants.

The factfinder's analysis of a claim for relief based upon a physician's alleged failure to secure his or her patient's informed consent necessarily involves the close examination of all of the physician's statements to the patient—oral, written or otherwise. The scope of inquiry accordingly is narrow, often focusing upon the specific wording of statements made and often resting exclusively on oral testimony. Because of this narrow scope and the meticulous nature of the analysis, we believe the trial court's factual finding that Dr. Strode had "failed" to specifically state that the vasectomy procedure might not succeed also amounted to the finding of a fact in substantial controversy. The finding was made in excess of the court's authority to so find pursuant to HRCP Rule 56(d) because it had the propensity to foreclose the jury's examination and analysis of the ultimate issue.

The inquiry before the jury for resolution was whether Dr. Strode provided Carr with sufficient information so as to insure that Carr's consent to submit to the vasectomy procedure was "informed." The circuit court's finding that Dr. Strode *failed* to specifically state to Carr that "the vasectomy procedure might fail, and if such failure were to occur, that it would or could cause Carr to remain fertile or become fertile again in the future" not only foreclosed the jury's consideration of one of, if not the most, effective means of informing Carr of an important recognized risk associated with the vasectomy procedure, but closely paralleled the ultimate issue before the jury. Under the narrow circumstances surrounding the informed consent inquiry and, because of the similarity between the issue resolved by the circuit court's finding and the ultimate issue in the case, we believe the circuit court's finding amounted to reversible error due to the likelihood that it prejudiced the jury's consideration and resolution of the issue of Dr. Strode's liability on the informed consent claim.

Notwithstanding plaintiffs' contention that the court's finding implied nothing about either Dr. Strode's duty or its breach, it is clear that, in any informed consent case, the primary issue necessarily will be focused on some kind of purported "failure" by the defendant to tell the plaintiff something material about the medical procedure in question. Plaintiffs argue that the circuit court only found that Dr. Strode had "failed to *specifically state*" something of significance to Carr, and thereby did not preclude the possibility that Dr. Strode adequately informed Carr *in some other way* that the procedure might fail.

We believe, however, that this subtle distinction easily could have escaped the jury. Based on the language of the partial summary judgment order, as read by the trial judge, the jury could have concluded that the trial court had already determined that Dr. Strode had breached his duty to inform Carr of serious possible risks and complications of the proposed vasectomy. Moreover, we do not believe that the evidence tending to prove that Dr. Strode informed Carr of a ninety-nine percent success rate—and thereby also implicitly informed Carr of a one percent failure rate—associated with a vasectomy procedure, possesses a probative value of sufficient magnitude so as to adequately alleviate the potential prejudice stemming from the circuit court's finding.

As previously noted, after finding that Dr. Strode had "failed" to utter certain words, the circuit court, in its order granting partial summary judgment, stated that "[t]his Order does not limit any party's right to offer testimony concerning information provided to Mr. Carr prior to the procedure or the surrounding circumstances thereto at the trial." Plaintiffs contend that, even if the circuit court's finding had the potential to mislead the jury, the court obviated such potential by including the above-quoted language, thereby alleviating any potential confusion. We dis-

agree. We emphasize that the potential to mislead the jury with the prior finding of Dr. Strode's "failure" was too significant to be cured by the above disclaimer.

We therefore hold that the circuit court's finding in connection with its purported grant of partial summary judgment constituted prejudicial error as to the informed consent claim; accordingly, we vacate the order granting plaintiffs' motion for partial summary judgment and remand this case for a new trial on the issue of lack of informed consent.

### 2. Changes in Sorrell's Deposition

■ Defendants claim that Sorrell corrected her deposition transcript after the expiration of the thirty-day deadline set forth by HRCP Rule 30(e). Defendants also claim that Sorrell did not sign her correction sheet and that the trial court unfairly surprised them by allowing the changes after the Rule 30 deadline.

Plaintiffs admit to the untimely submission of Sorrell's corrections. However, plaintiffs argue that, at the time she was to review and sign the correction sheet, Sorrell lived on a United States military base in Japan and that the mail had to be sent first to Seattle, Washington, and then re-routed to Japan. Plaintiffs also state that Sorrell's misunderstanding about the correction procedure caused further delay. Instead of indicating her corrections on the correction sheet and executing it, Sorrell made changes on the deposition itself and sent it back without signing or noting those changes on the correction sheet, thus requiring a second mailing.

■ The admission of a deposition should be affirmed unless the admission constituted an abuse of discretion.[14] *Gallagher v. State,* 466 N.E.2d 1382, 1387 (Ind.App.1984) (citing *Jarvis v. State,* 441 N.E.2d 1, 7 (Ind.1982)). In *Gallagher,* the trial judge admitted an unsigned deposition of a witness for the pros-

---

14. Although Hawai'i's case law is silent on the standard of review in connection with HRCP Rule 30(e), the standard for admitting deposition corrections is similar to the standard for admitting evidence generally under HRCP Rule 36 Requests For Admission. *See W.H. Shipman, Ltd. v. Hawaiian Holiday Macadamia Nut Co.,* *Inc.,* 8 Haw.App. 354, 802 P.2d 1203 (1990), *cert. granted,* 71 Haw. 669, 833 P.2d 901, *cert. dismissed,* Order Dismissing Certiorari Proceeding (Dec. 13, 1990) (trial court abused its discretion by not admitting late responses to a request for admissions).

ecution. The Indiana Court of Appeals upheld the admission of the deposition because "[t]he state had only a very short time within which to get the deposition transcribed, reviewed and signed by [the state witness] before he disappeared." *Gallagher*, 466 N.E.2d at 1388. Plaintiffs argue that, like the deposition defects in *Gallagher*, the purported noncompliance with the time frame mandated by HRCP 30(e) in the instant case was similarly caused by extenuating circumstances; namely, Sorrell's foreign place of residence.

Unlike *Gallagher*, however, Sorrell made changes to her deposition, and opposing counsel did not receive notice of her changes until December 2, 1991, five days before trial was to begin. Defendants argue that Sorrell's belated attempt to correct her deposition unfairly surprised defendants and should not have been allowed. We agree with defendants that the circumstances of this case give rise to the potential for unfair surprise. The changes made to Sorrell's deposition testimony were substantive [15] and had the potential to affect defendants' trial preparation and strategy.

█ A deponent's foreign place of residence may, in some cases, qualify as an "extenuating circumstance," meriting exception from the time limits prescribed in HRCP Rule 30(e). However, in the present situation, the untimely submission of Sorrell's deposition corrections was caused at least as much by Sorrell's foreign place of residence as it was by Sorrell's misunderstanding of the correction process, which required a second mailing to her foreign place of residence.

Sorrell's misunderstanding of the correction process may, in turn, be attributed to Sorrell's counsel's failure to promptly provide Sorrell with a copy of her deposition for review and correction and/or to adequately explain the correction process. Thus, we believe that, in the present situation, Sorrell's foreign place of residence does not qualify as an extenuating circumstance, meriting exception from the time limits imposed by HRCP Rule 30(e). Therefore, we hold that the trial court abused its discretion in allowing Sorrell to correct or change her original deposition testimony. Accordingly, the corrections/changes to Sorrell's deposition shall not be allowed on remand, and plaintiffs are bound by Sorrell's original deposition testimony.

### III. CONCLUSION

Based on the foregoing, we: (1) affirm the (a) order denying defendants' motion for summary judgment, or, in the alternative, for partial summary judgment, (b) order denying defendants' various motions in limine, and (c) court's giving of plaintiffs' instruction no. 11; and (2) reverse the (a) judgment in favor of defendants, (b) conditional grant of a new trial, (c) order granting plaintiffs' motion for partial summary judgment, and (d) order denying defendants' motion for reconsideration. Accordingly, we remand this case for a new trial solely on the issue of informed consent.

---

15. Sorrell made three changes to her deposition. The relevant questions, answers, and the changes as indicated by Sorrell's correction sheet (changes illustrated in bold) provide:

Q. Did you and [your husband] talk about the various methods of contraception including vasectomies and tubal ligations during this period of time when you were doing your research?
A. Yes, we talked about it.
**Delete "Yes we talked about it." Replace with "I cannot remember discussing this with my husband prior to his second vasectomy operation."**
Q. ... [W]as it your understanding at the time you were considering having the tubal ligation in connection with Ellen's delivery that vasectomies had a much better track record with regard to preventing pregnancies than birth control pills, diaphragms or condoms?
A. Yes, sir.
Q. And you discussed that with your husband prior to Ellen's delivery?
A. Yes, sir.
**Delete [the second] "Yes, sir." Replace with "I discussed with him that I wanted to have a tubal ligation."**
Q. As far as you understood from your conversations with your husband, he understood that the same way that you understood it?
A. Yes, sir.
**Delete "Yes, sir." Replace with "He thought it would be a good idea to get the tubal ligation done after Ellen's delivery."**