993 P.2d 516

SHANGHAI INVESTMENT COMPANY, INC., a Hawai'i corporation, Plaintiff–Appellee, Cross–Appellant,

v.

ALTEKA CO., LTD., a Japan corporation, Defendant–Appellant, Cross–Appellee.

Alteka Co., Ltd., a Japan corporation, Plaintiff–Appellant, Cross–Appellee,

v.

Windward Park, Inc., a Hawai'i corporation, Thomas Enomoto, Defendants–Appellees, Cross–Appellants,

and

John Does 1–10, Doe Partnerships 1–10, Doe Corporations 1–10, Defendants.

No. 20709.

Supreme Court of Hawai'i.

Jan. 21, 2000.

As Amended Feb. 4, 2000.

Paul Alston (David A. Nakashima, Alicia M. Leonhard, Lea Hong with him on the brief) on the briefs, Honolulu, for plaintiff-appellant/cross-appellee.

Steven K.S. Chung (Michel A. Okazaki with him on the brief), on the briefs, Honolulu, for defendants-appellees/cross-appellant.

KLEIN, Acting C.J., LEVINSON, NAKAYAMA, and RAMIL, JJ. and Circuit Court Judge NAKATANI in place of MOON, C.J., Recused.

Opinion of the Court by KLEIN, J.

This appeal arises out of a contract to purchase two parcels of property by plaintiff-appellant Alteka Co., Ltd. (Alteka) from defendant/appellee/cross-appellant Windward Park, Inc. (Windward). Shanghai Investment Co. (Shanghai), the alleged assignee of a promissory note from Alteka, sued Alteka for specific performance of the agreement to assign, or, in the alternative, damages for breach of the agreement to assign in Civil No. 94–2683–07. Alteka subsequently filed suit against Windward and Thomas Enomoto (Enomoto), Windward's principal, for return of a deposit made on the purchase of the properties in Civil No. 95–3483–09. The cases were consolidated on January 19, 1996. Alteka appeals and Windward cross-appeals from, *inter alia*, the first circuit court's May 12, 1997 amended final judgment in favor of Alteka in Civil No. 94–2683–07 and against Shanghai, and in favor of Windward in Civil No. 95–3483–09 and against Alteka.

On appeal, Alteka contends that: (1) the trial court improperly awarded Windward a $5 million forfeiture against Alteka contrary to *Jenkins v. Wise, infra*, and its progeny; (2) Windward impermissibly asserted a new counterclaim without leave of court on the eve of trial; (3) the trial court erred in awarding Windward damages under the original agreement where (a) Windward was unable to perform under the agreement, (b) the parties' August 7, 1992 amendment superseded the original January 2, 1990 agreement, and (c) the jury verdict was "hopelessly inconsistent"; (4) Alteka was entitled to fraud damages; (5) Windward's "prejudicial innuendo" and argument was improper; (6) Windward's "xenophobic arguments" and accusations that Alteka's counsel was a liar were plain error; and (7) Alteka was entitled to an award of attorneys' fees and costs in successfully prevailing against Shanghai in Civil No. 94–2683–07.

Windward argues that: (1) the jury's finding that the amendment was supported by consideration was not supported by substantial evidence; (2) the trial court erred in granting Alteka's motion for stay pending appeal because it did not require Alteka to post a supersedeas bond; and (3) the trial

court erred in failing to require that Alteka grant Windward a mortgage interest in its real property.

For the reasons set forth below, we hold that the trial court did not err in: (1) allowing Windward's third counterclaim; (2) denying Alteka's motion for JNOV on the issue of jury verdict inconsistency; (3) denying Windward's motion for JNOV on the issue of the enforceability of the amendment; (4) denying fraud damages to Alteka; (5) allowing Enomoto's testimony; and (6) granting Alteka's stay on appeal.

We hold, however, that the trial court erred in (1) awarding Windward $5 million in damages against Alteka inasmuch as Windward did not adduce evidence at trial that the $5 million bore a reasonable relationship to its actual loss; and (2) denying Alteka's request for attorneys' fees and costs incurred in successfully defending against the claims made by Shanghai. We therefore vacate the $5 million damage award to Windward and remand to the trial court with instructions to (1) enter judgment in favor Alteka for $1,171,949.76 plus interest and (2) determine and award reasonable attorneys' fees to Alteka against Windward and Shanghai in accordance with this opinion. In all other respects, we affirm.[1]

## I. BACKGROUND

On January 2, 1990, Alteka and Windward executed a Purchase and Sale Agreement (the "agreement" or "original agreement"), under which Alteka was to pay Windward $35 million for two adjoining parcels of fee simple land and all land use permits for construction of an 18–hole golf course. The first parcel, the former site of the Kailua Drive–In outdoor theater (the "Drive–In parcel"), consisted of 24 acres. The second parcel (the "Texeira parcel"), located adjacent to the Drive–In parcel was owned by Nakamoto Properties, Inc., Antone S. Texeira, and Marjory Ann Texeira and consisted of approximately 319 acres. George Okamura (Okamura) and Keiji Fujita (Fujita) participated in the negotiations on behalf of Alteka.

In accordance with the agreement, Alteka made a $5 million earnest money deposit (the "deposit") to Windward to be used for project expenses. These expenses included acquiring the fee simple interest in the Texeira parcel, obtaining the leasehold and fee simple interests in the Drive–In parcel, and procuring the necessary permits for construction of a golf course.[2] Under the agreement, the deposit was "nonrefundable" except as otherwise provided in the contract.

Also pursuant to the agreement, Alteka retained the right to terminate the agreement and recover the entire deposit if Windward did not acquire the land in fee simple and the necessary permits by December 31, 1992. Alteka was entitled to give notice of cancellation at any time between December 31, 1992 and December 31, 2005. In the event of cancellation by Alteka, Windward was required to repay any amounts withdrawn from the deposit within 90 days, along with interest computed at the same rate of interest that the balance of the deposit was earning in escrow. To secure repayment of the deposit, Windward gave Alteka a $5 million promissory note (the "note"), which was secured by a personal guaranty by Thomas Enomoto, Windward's principal.

In December 1990, Windward obtained a shoreline management area permit, which required as a condition of its issuance that the development be completed by December

---

1. As discussed below, the trial court in its May 12, 1997 amended final judgment, awarded Alteka Co. Ltd. $1,171,949.76 plus interest in the amount of $69,080.51 in Civil No. 95–3483–09, and awarded Windward Park, Inc. $5,000,000.00 in Civil No. 95–3483–09. It thereby entered a net judgment in the amount of $3,758,969.73, plus post-judgment interest at the rate of 10% per annum until the judgment is satisfied, in favor of Windward Park, Inc. and against Alteka Co., Ltd.

2. On June 21, 1988, Thomas Enomoto, the principal of Windward, obtained an option to purchase the Texeira parcel for approximately $5.7 million. On May 8, 1989, he agreed to pay $900,000 for the lease for the adjacent Drive–In parcel and obtained the right to purchase the fee simple interest for $2.7 million.

 The required permits included a shoreline management area permit for the Drive–In parcel because of its proximity to Kawainui Marsh and a conservation district use permit for the Texeira parcel.

1993. Upon obtaining the permit, Windward began negotiations to purchase the Texeira parcel. At that point, however, Windward indicated to Alteka that it was "not prudent" to pursue the purchase of the Texeira parcel. Apparently, an individual named Marco Rivera had obtained the right to purchase the Texeira parcel and had attempted to sell it to Windward for $29 million instead of the $5.7 million figure provided in Windward's prior option to purchase. *See supra* note 1. As a result, Windward reported to Alteka in its March 1991 quarterly report that "it is probably not feasible at this time to actively pursue the purchase of this parcel." In its July 31, 1991 status report, Windward further notified Alteka, *inter alia,* that the purchase of the Texeira parcel was not feasible because: (1) the owner had inflated the purchase price from $5.7 million to $55 million; (2) Windward was unable to locate a non-potable water source; and (3) the City and County of Honolulu was requesting "$100 million impact fees as a condition to permitting a golf course." Windward concluded that, "for the immediate foreseeable future, we will take no further action unless we hear from you otherwise."

Meanwhile, Windward continued with preparation of the Drive–In parcel for purposes of a driving range.[3] On May 6, 1991, Windward drew $1,171,949.76 from the deposit to acquire the lease for the Drive–In parcel and to pay various project expenses.

Upon notice of Windward's indication that it was not prudent to proceed with the purchase of the Texeira parcel, Alteka canceled the agreement and requested a refund of its deposit by letter dated January 22, 1992. Windward maintained that Alteka did not have the right to cancel before December 31, 1992. Upon Windward's unwillingness to cancel the agreement, Alteka sent a second notice of cancellation on April 8, 1992. This time, Windward agreed to the cancellation, but could not immediately return the deposit. It did suggest, however, that the parties

restructure the agreement if Windward could obtain outside financing.

On August 7, 1992, Alteka and Windward entered into an amendment to the agreement (the "amendment"), drafted by Windward's attorneys. In it, the parties provided, *inter alia,* (1) that Alteka could elect to cancel at any time after June 19, 1992, the effective date of the amendment, notwithstanding paragraphs 3.4 and 4 of the original agreement, (2) a new interest rate for the portion of the deposit spent by Windward, and (3) a deadline for Windward to repay the $1,171,-949.76 pursuant to the promissory note executed simultaneously with the amendment. The amendment also stated that "the terms of the Agreement and the Note shall remain in full force and effect." Windward maintained that, as consideration, Alteka orally agreed to obtain an investor for the property.

Windward ultimately did not repay the $1,171,949.76 balance. Fujita, who managed Alteka's affairs in Hawai'i, then apparently hired an allegedly convicted felon, Henry Kaiser (Kaiser), to collect the debt. Kaiser contacted Enomoto, and demanded and was paid $10,000 for an extension of the deadline to obtain an investor for the property. Because Windward was unable to obtain outside financing, the shoreline area management permit expired without any development being completed.

After unsuccessful attempts to resolve the issue, Fujita and Enomoto sought to negotiate a settlement in which Windward would pay Alteka $400,000. Because Windward did not have the funds, Enomoto, a fifty percent owner of Shanghai, arranged for Shanghai to pay the amount. Enomoto claimed that, pursuant to the settlement, Alteka had agreed to assign the $1,171,949.76 note to Shanghai for $400,000. Alteka contended, however, that no assignment was made, inasmuch as no one from Alteka had signed the proposed assignment. Although settlement documents were

---

**3.** The facts are in dispute as to the manner in which the parcels were to be obtained and developed. Alteka contends that Windward was to acquire both parcels, enabling Alteka to develop an 18–hole golf course on the total acreage. Windward, on the other hand, maintains that the parties agreed that the project would be completed in two phases: the Drive–In parcel would first be developed into a driving range, and the Texeira parcel would later be prepared to accommodate an 18–hole golf course.

prepared, they were never executed, and the settlement never occurred.

As a result of the foregoing, in Civil No. 94–2683–07, Shanghai sued Alteka for specific performance of the agreement to assign, or, in the alternative, for damages for breach of the alleged assignment. In a related suit, Civil No. 95–3483–09, Alteka sued Windward on its alleged breach of the amendment, fraudulent assignment by Enomoto, and return of the $1,171,949.76 sum. Windward counterclaimed on October 7, 1995, alleging that Alteka had breached the agreement by sending a notice of cancellation and that it was entitled to damages as a result of the breach. The two cases were consolidated on January 19, 1996.

On February 28, 1996, Alteka amended its complaint. On March 8, 1996, Windward answered and filed an amended counterclaim, asserting, again, that Alteka had breached the agreement by sending notice of cancellation and that it was entitled to damages resulting from the breach.

Shortly before trial, Windward sold the Drive–In parcel to Le Jardin Academy for approximately $1.5 million. Upon learning of the sale, Alteka obtained leave of court to add a claim for unjust enrichment. Alteka filed a second amended complaint on July 24, 1996. Windward counterclaimed on August 2, 1996, alleging, *inter alia*, that, as a result of Alteka's breach of the agreement, Windward was entitled to keep Alteka's $5 million deposit as liquidated damages. In response, Alteka filed a motion to strike the counterclaim. The motion was subsequently denied by the court on the first day of trial, August 12, 1996.

On August 26, 1996, after the close of the evidence, all parties moved for a directed verdict. The trial court did not rule on the motions. On August 29, 1996, the jury returned a special verdict, awarding Windward $5 million for Alteka's breach of the agreement and awarding Alteka $1,171,949.76, plus interest, for Windward's failure to pay the note, $1,171,949.76 for Windward's breach of the amendment, and $771,949, plus interest, for Windward's purported assignment of the Note to Shanghai.

After the foreperson indicated that the jury had not intended to award Windward $5 million in damages, the trial court asked the jury to revisit the entire special verdict form. After further deliberation, the jury awarded Windward $3,828,050 and left its earlier award to Alteka intact.[4] On October 9, 1996, Windward filed a motion for JNOV.

On the same day, the trial court entered judgment pursuant to the special verdict, ruling in pertinent part as follows:

> ... [I]n Civil No. 94–2683–07, judgment is hereby entered in favor of Alteka, Co., Ltd. and against Shanghai Investments, Inc. on all claims.
>
> In Civil No. 95–3483–09, judgment is hereby entered in favor of Windward Park, Inc., for THREE MILLION EIGHT HUNDRED TWENTY–EIGHT THOUSAND FIFTY DOLLARS ($3,828,050.00) against Alteka, Co., Ltd. as damages for breach of the Purchase and Sale Agreement, dated January 2, 1990.
>
> In Civil No. 95–3483–09, judgment is hereby entered in favor of Alteka Co., Ltd. for ONE MILLION ONE HUNDRED SEVENTY–ONE THOUSAND NINE HUNDRED FORTY–NINE DOLLARS AND SEVENTY–SIX CENTS ($1,171,949.76) plus interest against Windward Park, Inc. and Thomas Enomoto, jointly and severally, as damages for the breach of the Amendment to Purchase and Sale Agreement and Promissory Note, dated August 7, 1992.
>
> In Civil No. 95–3483–09, judgment is hereby entered in favor of Alteka, Co., Ltd. for SEVEN HUNDRED SEVENTY–ONE THOUSAND NINE HUNDRED FORTY–NINE DOLLARS ($771,949.00) plus interest, against Windward Park, Inc. and Thomas Enomoto, jointly and severally, as damages for fraud.
>
> In Civil No. 95–3483–09, judgment is hereby entered in favor of Alteka, Co., Ltd. for ONE MILLION ONE HUNDRED SEVENTY–ONE THOUSAND

---

4. The jury found that Windward was unjustly enriched by its sale of the Drive–In parcel, but awarded no damages to Alteka regarding that transaction.

NINE HUNDRED FORTY–NINE DOL-LARS AND SEVENTY–SIX CENTS ($1,171,949.76) plus interest against Windward Park, Inc. as restitution for Windward Park's failure to pay the Promissory Note.

All other claims in these consolidated civil actions are hereby dismissed.

On October 11, 1996, Alteka filed a motion for JNOV, or in the alternative, for a new trial on count I of Windward's counterclaim. On November 19, 1996, the trial court denied the motion. The trial court thereafter granted in part and denied in part Windward's motion for JNOV on November 21, 1996. In its order granting and denying in part Windward's motion, the trial court (1) amended the $3,828,050 damage award in favor of Windward for Alteka's breach of the agreement to $5 million plus post judgment interest, (2) set aside the $771,949 fraud damage award in favor of Alteka and ordered that judgment be entered in favor of Windward, (3) set aside the $1,171,949.76 award against Windward for breach of the amendment and the $1,171,949.76 award in favor of Alteka as restitution for Windward's failure to pay the Note and ordered entry of one judgment in favor of Alteka in the amount of $1,171,949.76 plus interest, and (4) ordered that an amended judgment be entered in favor of Windward in the amount of $3,758,969.73 plus interest, attorneys' fees of $152,955.50, and costs of $14,136.77. The trial court denied all other relief requested.

On the same day, the trial court entered an amended judgment, preserving Alteka as the prevailing party over Shanghai in Civil No. 94–2683–07, but ruling against Alteka in Civil No. 95–3483–09. Specifically, the trial court ruled that:

In Civil No. 94–2683–07, judgment is hereby entered in favor of Alteka Co., Ltd. and against Shanghai Investments, Inc. on all claims;

In Civil No. 95–3483–09, judgment is hereby entered [in] favor of Windward Park, Inc. and against Alteka Co., Ltd. for Three Million Seven Hundred Fifty–Eight Thousand Nine Hundred Sixty–Nine and ⁷⁹/₁₀₀ Dollars ($3,758,969.73) plus post-judgment interest at the rate of ten percent

(10%) per annum until the judgment is satisfied.

In Civil No. 94–2683–07 and Civil No. 95–3483–09, attorney's fees of One Hundred Fifty–Two Thousand Nine Hundred fifty-Five and ⁵⁰/₁₀₀ dollars ($152,955.50) and costs of Fourteen Thousand One Hundred Thirty–Six and ⁷⁷/₁₀₀ Dollars ($14,136.77) are awarded to Windward Park, Inc. and assessed against Alteka Co., Ltd.[.]

On November 29, 1996, Alteka moved to alter or amend the new judgment, which the trial court denied. Both Alteka and Windward appealed. This court, on April 10, 1997, dismissed the appeals on the ground that the amended judgment did not specifically identify the claims adjudged or dismissed and, as such, was not a "final" judgment.

On May 2, 1997, the trial court entered its final judgment, stating in relevant part as follows:

In Civil No. 94–2683–07, judgment is hereby entered in favor of Alteka Co., Ltd. and against Shanghai Investment Company, Inc. on Counts I and II of Shanghai's Complaint for Specific Performance and Damages.... Pursuant to the November 19, 1996, Order Denying Alteka Co., Ltd's Motion for Attorney's Fees as to the Claims of Shanghai Investment Company, Inc. filed on October 8, 1996, the request by Alteka Co., Ltd. for an award of costs and attorney's fees was denied.

In Civil No. 95–3483–09, Alteka Co. Ltd. is awarded One Million One Hundred Seventy–One Thousand Nine Hundred Forty Nine and ⁷⁶/₁₀₀ Dollars ($1,171,949.76) plus interest in the amount of Sixty Nine Thousand Eighty and ⁵¹/₁₀₀ Dollars ($69,080.51), on the First, Second and Fourth Claims contained in Alteka Co., Ltd.'s Second Amended Complaint.... In Civil No. 95–3483–09, Windward Park, Inc. is awarded Five Million and No/100 Dollars ($5,000,-000.00) in damages on Count I of its Counterclaim against Alteka Co., Ltd., filed on August 2, 1996. Accordingly, a net judgment in the amount of Three Million Seven Hundred Fifty–Eight Thousand Nine Hundred Sixty–Nine and ⁷⁹/₁₀₀ Dollars ($3,758,-

969.73), plus post-judgment interest at the rate of ten percent (10%) per annum until the judgment is satisfied, is hereby entered in favor of Windward Park, Inc. and against Alteka Co., Ltd.

An amended final judgment was entered on May 12, 1997. It provided in pertinent part that:

> In Civil No. 95–3483–09, Alteka Co. Ltd. is awarded One Million One Hundred Seventy–One Thousand Nine Hundred forth Nine and $^{76}/_{100}$ dollars ($1,171,949.76) plus interest in the amount of Sixty Nine Thousand Eighty and $^{51}/_{100}$ Dollars ($69,080.51), on the First, Second and Fourth Claims contained in Alteka Co., Ltd.'s Second Amended Complaint.... In Civil No. 95–3483–09, Windward Park, Inc. is awarded Five Million and No/100 Dollars ($5,000,-000.00) in damages on Count I of its Counterclaim against Alteka Co., Ltd.... Accordingly, a net judgment in the amount of Three Million Seven Hundred Fifty–Eight Thousand Nine Hundred sixty-Nine and $^{73}/_{100}$ Dollars ($3,758,969.73), plus post-judgment interest at the rate of ten percent (10%) per annum until the judgment is satisfied, is hereby entered in favor of Windward Park, Inc. and against Alteka Co., Ltd.
>
> In Civil No. 94–2683–07 and Civil No. 95–3483–09, attorney's fees of One Hundred Fifty–Two Thousand Nine Hundred Fifty–Five and $^{50}/_{100}$ dollars ($152,955.50) and costs of Fourteen Thousand One Hundred Thirty–Six and $^{77}/_{100}$ Dollars ($14,-136.77) are awarded to Windward Park. Inc. and assessed against Alteka Co. Ltd.[.]

Thereafter, Alteka filed a Hawai'i Rules of Civil Procedure (HRCP) Rule 59 motion to alter or amend the judgment on the grounds that: (1) the forfeiture was inconsistent with controlling decisions of this court and the Intermediate Court of Appeals; (2) the amended final judgment was inconsistent with the jury's verdict and the trial court's post trial rulings; (3) Alteka was entitled to recover attorneys' fees and costs in defending against Shanghai's attempt to enforce the assignment; and (4) the trial court's denial of Alteka's motion to strike Windward's amended counterclaim was manifest error. The trial court denied the motion.

Both Alteka and Windward timely appealed.

## II. STANDARDS OF REVIEW

### A. Judgment Notwithstanding the Verdict

■ [D]enials of directed verdict or judgment notwithstanding the verdict (JNOV) motions are reviewed *de novo*. Verdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the jury's findings. We have defined "substantial evidence" as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

In deciding a motion for directed verdict or JNOV, the evidence and the inferences which may be fairly drawn therefrom must be considered in the light most favorable to the nonmoving party and either motion may be granted only where there can be but one reasonable conclusion as to the proper judgment.

*O'Neal v. Hammer,* 87 Hawai'i 183, 186, 953 P.2d 561, 564 (1998) (quoting *Takayama v. Kaiser Foundation Hosp.,* 82 Hawai'i 486, 495, 923 P.2d 903, 912 (1996) (citation and brackets omitted)).

### B. New Trial

■ " 'Both the grant and the denial of a motion for new trial is within the trial court's discretion, and we will not reverse that decision absent a clear abuse of discretion.' " *Kawamata Farms v. United Agri Products,* 86 Hawai'i 214, 251, 948 P.2d 1055, 1092 (1997) (quoting *State v. United States Steel Corp.,* 82 Hawai'i 32, 54, 919 P.2d 294, 316 (1996) (citations and internal quotation marks omitted)). " 'A ... court abuses its discretion whenever it exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party.' " *Abastillas v. Kekona,* 87 Hawai'i 446, 449, 958 P.2d 1136, 1139 (1998) (quoting *Kawamata*

*Farms,* 86 Hawai'i at 241, 948 P.2d at 1082).

*Ho v. Leftwich,* 88 Hawai'i 251, 256, 965 P.2d 793, 798 (1998).

### C. *Attorneys' Fees*

██ This court reviews the circuit court's denial and granting of attorney's fees under the abuse of discretion standard. *TSA International Ltd., v. Shimizu Corp.,* 92 Hawai'i 243, 253, 990 P.2d 713, 723 (1999) (quoting *Canalez v. Bob's Appliance Serv. Ctr., Inc.,* 89 Hawai'i 292, 299, 972 P.2d 295, 302 (1999) (citing *Eastman v. McGowan,* 86 Hawai'i 21, 27, 946 P.2d 1317, 1323 (1997) (citation omitted); *Coll v. McCarthy,* 72 Haw. 20, 28, 804 P.2d 881, 887 (1991))).

### D. *Motion to Strike Untimely Counterclaim*

██ "Since the decision whether to allow [a] counterclaim to be pleaded is a matter of judicial discretion, it can be reversed on appeal only if the party can demonstrate that the court abused its discretion." 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure: Omitted Counterclaims* § 1430 (1983).

### E. *Equitable Relief*

██ "The relief granted by a court [in] equity is discretionary and will not be overturned on review unless the [circuit] court abused its discretion by issuing a decision that clearly exceeds the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of the appellant." *Aickin v. Ocean View Investments Co., Inc.,* 84 Hawai'i 447, 453, 935 P.2d 992, 998 (1997) (quoting *AIG Hawai'i Insurance Company, Inc., v. Bateman,* 82 Hawai'i 453, 457, 923 P.2d 395, 398 (1996) (citations and internal quotation marks omitted)).

### F. *Rule 59 Motion To Alter or Amend Judgment*

██ A motion made pursuant to HRCP 59(e) to alter or amend the judgment is reviewed under the abuse of discretion standard. *Gossinger v. AOAO of the Regency of Ala Wai,* 73 Haw. 412, 425, 835 P.2d 627, 634 (1992).

### G. *Evidentiary Rulings*

██ [D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue. When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard.

*Tabieros v. Clark Equipment Co.,* 85 Hawai'i 336, 350, 944 P.2d 1279, 1293 (1997) (quoting *Kealoha v. County of Hawaii,* 74 Haw. 308, 319, 844 P.2d 670, 676, *reconsideration denied,* 74 Haw. 650, 847 P.2d 263 (1993)). " 'Evidentiary decisions based on HRE Rule 403, which require a 'judgment call' on the part of the trial court, are reviewed for an abuse of discretion.' " *Id.* at 351, 944 P.2d at 1294 (quoting *Walsh v. Chan,* 80 Hawai'i 212, 215, 908 P.2d 1198, 1201, (1995) (citing *Sato v. Tawata,* 79 Hawai'i 14, 19, 897 P.2d 941, 946 (1995))).

### H. *Plain Error*

██ If the substantial rights of a party have been affected adversely, the error will be deemed plain error. *State v. Sawyer,* 88 Hawai'i 325, 330, 966 P.2d 637, 642 (1998) (citing *State v. Pinero,* 75 Haw. 282, 291–92, 859 P.2d 1369, 1374 (1993)).

[i]n civil cases, the plain error rule is only invoked when "justice so requires." We have taken three factors into account in deciding whether our discretionary power to notice plain error ought to be exercised in civil cases: (1) whether consideration of the issue not raised at trial requires additional facts; (2) whether its resolution will affect the integrity of the trial court's findings of fact; and (3) whether the issue is of great public import.

*Montalvo v. Lapez,* 77 Hawai'i 282, 290, 884 P.2d 345, 353 (1994) (quoting *State v. Fox,* 70 Haw. 46, 56 n. 2, 760 P.2d 670, 676 n. 2 (1988) (citing *Jorgensen v. Mark Constr., Inc.,* 56 Haw. 466, 476, 540 P.2d 978, 985 (1975) (other citations omitted))), *reconsideration denied,* 77 Hawai'i 489, 889 P.2d 66 (1994).

## III. *DISCUSSION*

### A. *The trial court did not abuse its discretion in denying Alteka's motion to strike Windward's third counterclaim.*

Alteka argues that the trial court erred in denying its motion to strike Windward's third counterclaim because (1) Windward unduly delayed in raising the claim, and (2) the addition of a new claim substantially prejudiced Alteka. We disagree.

Under HRCP Rule 13(a) (1990),[5] Windward was entitled to file a counterclaim arising out of the transaction or occurrence that was the subject matter of the claim in Alteka's second amended complaint. The remaining issue is whether the new claim alleged in Windward's third counterclaim unduly prejudiced Alteka. *See Hirasa v. Burtner,* 68 Haw. 22, 26, 702 P.2d 772, 775 (1985) (amendment of pleadings is proper absent "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment") (quoting *Bishop Trust Co. v. Kamokila Development Corp.,* 57 Haw. 330, 337, 555 P.2d 1193, 1198 (1976) (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962))); *Kahalepauole v. Associates Four,* 8 Haw.App. 7, 14, 791 P.2d 720, 724 (1990) (stating similar principle). *See also Jackson v. Bank of Hawaii,* 902 F.2d 1385, 1388 (9th Cir.1990) (no abuse of discretion in disallowing amendment of pleading where "the moving party knew or should have known the facts and theories raised by the amendment in the original pleading") (citations omitted); *Cranberg v. Consumers Union, Inc.,* 756 F.2d 382, 392 (5th Cir.), *certiorari denied,* 474 U.S. 850, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985) (amendment of pleading properly denied where proposed amendment would interject new claims or issues).

In this case, Alteka filed its second amended complaint on July 24, 1996. Nine days later, Windward filed an answer and counterclaim. Windward's counterclaim asserted, *inter alia,* that Alteka had breached the agreement by sending Windward notices of cancellation on January 22, 1992 and April 8, 1992. The counterclaim also asserted that, because Alteka failed to obtain a purchaser for the driving range, Windward received no consideration for the amendment. Paragraph 15 of the counterclaim alleged for the first time that, as a result of Alteka's breach of the agreement, Windward was entitled to keep Alteka's $5 million deposit as liquidated damages.

We discern little prejudice to Alteka in the trial court's adjudication of Windward's third counterclaim. The counterclaim did not set forth a novel, complex claim requiring additional discovery. In fact, except for its request for the $5 million deposit as liquidated damages, the third counterclaim set forth substantially similar allegations as did Windward's two earlier counterclaims, filed October 7, 1995 and March 8, 1996. Those earlier counterclaims, like the third, alleged that Alteka had breached the agreement and that Windward was entitled to damages as a result of the breach.

Moreover, Alteka has failed to show that any delay in Windward's assertion of a claim requesting retention of the deposit impaired Alteka's ability to present a defense against Windward's breach of contract counterclaim. Alteka was presumably prepared for the August 12, 1996 trial date and knew well the nature of Windward's breach of contract allegation. The damages claim did not involve facts unknown to Alteka inasmuch as the parties agreed from the start that the $5 million deposit was nonrefundable except as otherwise provided in the agreement. Indeed, to defend against Windward's new damages allegation, Alteka would not have to change its strategy as to the substantive claim itself.

---

**5.** HRCP Rule 13(a) provides:
 (a) **Compulsory Counterclaims.** A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, *if it arises out of the transaction or occurrence that is the* subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.
(Emphasis added.)

Finally, we note that because Windward's counterclaim is compulsory, *see supra* note 4, the reasons for allowing its introduction are persuasive. Windward could not assert the claim in subsequent cases, and would lose the opportunity to have the claim adjudicated if its counterclaim were to be disallowed. Thus, because Windward's third counterclaim does not appear to have caused Alteka undue hardship or prejudice, we hold that the trial court did not abuse its discretion in denying Alteka's motion to strike Windward's counterclaim.

B. *The trial court erred in awarding Windward Alteka's $5 million earnest money deposit in damages.*

■ Alteka contends that it was "grossly inequitable" for the trial court to cause the forfeiture of its $5 million earnest money deposit because (1) it did not act in bad faith and (2) Windward failed to present any "substantial evidence" that the $5 million in damages bore any relationship to its actual loss. We agree.

■ This court has long adhered to the maxim that "equity abhors forfeitures and[,] where no injustice would thereby result to the injured party, equity will generally favor compensation rather then forfeiture against the offending party." *Jenkins v. Wise*, 58 Haw. 592, 597, 574 P.2d 1337, 1341 (1978) (citing *Bohnenberg v. Zimmermann*, 13 Haw. 4 (1900) (other citations omitted)). *See also Aickin*, 84 Hawai'i 447, 935 P.2d 992; *K.M. Young & Associates v. Cieslik*, 4 Haw.App. 657, 675 P.2d 793 (1983), *reconsideration denied*, 5 Haw.App. 683, 753 P.2d 253 (1984); *Scotella v. Osgood*, 4 Haw.App. 20, 659 P.2d 73 (1983); *Ventura v. Grace*, 3 Haw.App. 371, 650 P.2d 620 (1982); *Food Pantry, Ltd. v. Waikiki Business Plaza, Inc.*, 58 Haw. 606, 575 P.2d 869 (1978). As such, the Intermediate Court of Appeals (ICA) has indicated that

> where the purchaser's breach does not involve bad faith conduct, a provision in an agreement stating that in the event of purchaser's default the seller may elect to keep all payments as liquidated damages may be enforced by the seller *if there is a reasonable relation between the amount of*
> *payments retained and the amount of seller's actual damages.*

*Gomez v. Pagaduan*, 1 Haw.App. 70, 75, 613 P.2d 658, 662 (1980) (emphasis added). *See also Dias v. Vanek*, 67 Haw. 114, 117–18, 679 P.2d 133, 135 (1984); *Ventura*, 3 Haw.App. at 374, 650 P.2d at 622. "Actual damages" include

> (1) excess of contract price over fair market value of the property at termination, (2) interest due during the purchaser's equitable ownership, (3) actual or estimated costs of resale of the property on or about the termination date, (4) any payments other than principal and interest required under the agreement which the purchaser failed to make, and (5) any expenses or damages which the seller is entitled to under the agreement upon the purchaser's breach.

*Gomez*, 1 Haw.App. at 76, 613 P.2d at 662.

In *Gomez*, the buyers entered into an agreement of sale with the sellers for the purchase of a condominium apartment for $60,000.00. *Id.* at 76, 613 P.2d at 659. Under the agreement, the buyers paid $10,-000.00 cash and agreed to make interest only payments of $375.00 per month. *Id.* The agreement provided that, in the event of the purchasers' default, the sellers may elect to cancel the agreement and that "all payments made by the purchaser 'shall be retained by the seller, absolutely, without any other or further notice, and shall be deemed to be liquidated damages....'" *Id.* at 76, 613 P.2d at 660. When the purchasers failed to make certain interest payments when they came due, the sellers filed a complaint attempting to cancel the agreement and retain all sums paid by the purchasers as liquidated damages. *Id.* In its Order Granting Partial Summary Judgment Canceling Agreement of Sale, the trial court articulated, *inter alia*, pertinent undisputed facts which formed the basis for its ruling. These facts included: (1) the amount the purchasers paid to the sellers, (2) the fair rental value of the condominium during its occupancy by purchasers, (3) the fair market value of the condominium after the agreement was executed, and (4) the amount sellers paid to a real estate broker in connection with the sale. *Id.* at 72,

613 P.2d at 660. In light of these findings, the trial court thereby concluded that the sellers were entitled to retain "as liquidated damages and/or as actual damages all sums paid to them" by the purchasers. *Id.* at 73, 613 P.2d at 660. On appeal, the ICA affirmed the trial court's ruling. *Id.* at 76, 613 P.2d at 662.

In the instant case, the jury found that Alteka's breach involved neither bad faith nor intentional conduct. In its special verdict, the jury concluded that Alteka did not "act willfully, wantonly, maliciously, and/or intentionally when it gave notice to cancel the Agreement with Windward Park[.]" Consequently, under *Gomez,* Windward was entitled to retain the deposit made by Alteka as liquidated damages only if the amount of those damages bore a reasonable relation to Windward's actual damages.

The record reveals that, although Windward had a full and fair opportunity at trial to adduce evidence that the $5 million in damages bore a reasonable relationship to its actual damages, it did not do so. As far as we can discern from the record, the only evidence adduced by Windward consisted of the following: (1) in 1988, four years before the termination of the Alteka–Windward original agreement, Windward received and rejected an offer to buy the Texeira parcel for $15 million;[6] (2) in 1989, three years before the termination of the original agreement, Windward received and rejected an offer to buy both parcels for $35 million; (3) in 1991, Windward received inquiries about the Drive–In parcel, but received "no offers" for that parcel; (4) Windward incurred no expenses in connection with the agreement because it drew $1,171,949.76 from Alteka's deposit to purchase the leasehold interest in the Drive–In parcel for $900,000.00, and used the remainder to cover the expenses for "the processing, the environmental impact statement, DHM planning, all of the subconsultants, attorney fees, [and] escrow closing fees" incurred by Windward beginning in 1988; (5) Windward resold the Drive–In par-

cel for $1.5 million to Le Jardin Academy, but did not "offer[ ] to return any part of the $1.5 million that [it] received, to Alteka[ ]"; and (6) Enomoto was unable to determine how much of a profit Windward made on the resale of the Drive–In parcel, but that the expenses related to that resale, including "ground rents ... legal fees ... design and engineering and all other fees and costs associated with any kind of development[, and] brokerage fees and escrow costs" were taken from Alteka's deposit.

The jury, as a result, did not make any specific findings as to Windward's actual damages.[7] *See Dias,* 67 Haw. at 117, 679 P.2d at 135 ("[d]etermination of the proper amount of damages, if any, is within the exclusive province of the jury, since they are the sole judges of all disputed questions of fact") (citing *Sanchez v. Martinez,* 99 N.M. 66, 653 P.2d 897, 903 (N.M.Ct.App.1982); *Coney v. Lihue Plantation,* 39 Haw. 129 (1951)).

Thus, as the record reveals, evidence was not adduced and findings were not made as to the fair market value of the property at the termination date, the actual or estimated costs of resale of the property on or about the termination date, or the other items relating to actual damages enumerated in *Gomez.* The trial court nonetheless awarded Windward $5 million in damages on Count I of its counterclaim against Alteka, minus the $1,171,949.76 it awarded to Alteka on its first, second, and fourth claims contained in its second amended complaint against Windward.

■ "A non-defaulting seller is entitled to the benefit of the essence of his bargain.... He is not, absent purchaser's bad faith, entitled to forfeiture." *Gomez,* 1 Haw.App. at 75, 613 P.2d at 661–62. Guided by this precept, we therefore hold that the trial court erred in allowing Windward to retain the entire $5 million deposit as damages incurred by Windward as the result of Alteka's breach of the agreement.

6. According to Enomoto's testimony, one offer was to purchase only the Texeira parcel, and the other was to purchase both parcels.

7. In response to the question: "In what amount is Alteka liable for canceling the Agreement with Windward Park?" on the jury's special verdict form, the jury answered, "3,828,050."

C. *There was substantial evidence to support the jury's finding that the amendment was enforceable.*

Windward maintains that the jury's finding that the amendment to the agreement was enforceable was not supported by substantial evidence and should be set aside.[8] This argument is unpersuasive.

 It is well-settled that consideration is an essential element of, and is necessary to the enforceability or validity of, a contract. Consideration is defined as a bargained for exchange whereby the promisor receives some benefit or the promisee suffers a detriment. *Gibson v. Neighborhood Health Clinics, Inc.,* 121 F.3d 1126, 1130 (7th Cir.1997) (citations omitted). A modification of a contract must be supported by new consideration. *Honolulu Federal Savings and Loan Assn. v. Murphy,* 7 Haw.App. 196, 204, 753 P.2d 807, 813 (1988) (citations omitted).

 Windward argues that the amendment to the original agreement fails for lack of consideration because Alteka did not perform its oral promise to obtain a new purchaser for the driving range. Even aside from any alleged oral promise to obtain an investor, there was sufficient consideration to support the amendment inasmuch as Windward received a legal benefit through its receipt of a lower interest rate on the note.

Under the agreement, interest on the note "accrue[d] at the same rate as that being earned by the Earnest Money Deposit in Escrow[.]" Under this arrangement, the interest accrued at varying rates by agreement of the parties. For example, for the period of July 2, 1991 through October 1, 1991, the interest on the deposit accrued at the rate of 6.15% in a 92–day certificate of deposit, while during other periods, the deposit accrued at higher rates in 31–day terms.

Under the amendment, the parties amended the note to provide that the deposit remain in a 31–day certificate of deposit, thus allowing Windward to pay a lower rate of interest:

> The undersigned will also pay interest on the principal sum of this Note from and after June 19, 1992 at a rate of interest equal to the rate paid by First Hawaiian Credit Corp., Inc., on 31 day investment certificates such rate to be adjusted monthly and shall be equal to the rate in effect on the first day of that month. Interest will be computed on a 365–day year.

This slight difference in the interest rate provided a sufficient legal benefit to Windward. *See Long v. Buehler,* 8 Kan.App.2d 23, 648 P.2d 270, 275 (1982) ("the legal sufficiency of consideration for a promise [does not] depend upon the comparative economic value of the consideration and of what is promised in return") (citation omitted); *State of Colorado Department of Revenue v. Adolph Coors Company,* 724 P.2d 1341, 1347 (Colo.1986) (the "legal sufficiency of consideration does not depend on the comparative economic value of the exchange") (citing Restatement (Second) of Contracts § 79 (1981) (other citation omitted)). Accordingly, we hold that there was credible evidence of sufficient quality and probative value to enable the jury to conclude that the amendment to the agreement was supported by consideration.

D. *The jury's special verdict was not inconsistent.*

 Alteka contends that the jury's special verdict was inconsistent because it found simultaneously (1) that Windward breached the amendment and owed Alteka $1,171,-949.76 plus interest and (2) that Alteka breached the original agreement and owed Windward $3,828,050. With regard to inconsistent jury verdicts, this court has stated that

> [a] conflict in the jury's answers to questions in a special verdict will warrant a new trial only if those answers are irreconcilably inconsistent, and the verdict will not be disturbed if the answers can be reconciled under any theory.... When faced

---

8. The trial court did not make a finding as to whether the amendment stood on its own as an enforceable contract. In ruling that Alteka breached the original agreement and that Wind- ward breached the amendment, we assume for the purposes of this opinion that the trial court determined as such.

with a claim that the verdicts are inconsistent, the court must search for a reasonable way to read the verdicts as expressing a coherent view of the case, and must exhaust this effort before it is free to dismiss the jury's verdict and remand the case for a new trial.

*Carr v. Strode,* 79 Hawai'i 475, 489, 904 P.2d 489, 503 (1995) (quotation marks and citations omitted)).

■ In this case, the jury's verdict was not inconsistent inasmuch as the amendment to the agreement operated merely to modify the existing agreement rather than to supersede it. In general, "[a] modification of a contract is a change in one or more respects which introduces new elements into the details of the contract and cancels others but leaves the general purpose and effect undisturbed." *International Business Lists, Inc. v. American Telephone and Telegraph Co.,* 147 F.3d 636, 641 (7th Cir.1998) (citations omitted). "The original contract generally remains in force except as modified or superseded by the new agreement." *Scott v. Majors,* 980 P.2d 214, 218 (Utah App.1999) (citation and emphasis omitted)); *see also Thompson v. Gjivoje,* 896 F.2d 716 (2d Cir. 1990) ("[t]he modification of a contract results in the establishment of a new agreement between the parties which pro tanto supplants the affected provisions of the original agreement, while leaving the balance of it intact") (citations omitted).

Here, the parties to the amendment specifically indicated that they intended to amend (1) the time for cancellation, (2) the time for return of the deposit, and (3) the interest rate. Moreover, the amendment stated plainly that "the terms of the Agreement and the Note shall remain in full force and effect." As such, the amendment was properly viewed by the jury not as a substitute for the original agreement, but merely a modification of it. That being the case, we hold that the jury's verdict that Alteka breached the original agreement and that Windward simultaneously breached the amendment was not inconsistent.

**E.** *The trial court did not err in granting Windward's motion for JNOV on the issue of fraud and in striking the jury's damage award of $771,949 to Alteka.*

■ Alteka next maintains that the trial court erred in (1) granting in part Windward's motion for JNOV on the issue of fraud and (2) striking the jury's damage award for fraud. In response to the question, "Did Enomoto and Windward defraud Alteka by the alleged settlement, which they claim was to assign the promissory note to Shanghai for $400,000.00?" the jury answered in the affirmative. The jury thus awarded Alteka $771,949.76 in damages—the $1,171,-949.76 face value of the Note minus the $400,000 assignment value. The trial court then set aside the damage award on the grounds that Alteka had failed to prove that it had been damaged.

■ As this court explained in *Hawaii's Thousand Friends v. Anderson,* 70 Haw. 276, 286, 768 P.2d 1293, 1301 (1989), [t]he evidence must be clear and convincing to support a finding of fraud. *See Dobison v. Bank of Hawaii,* 60 Haw. 225, 226, 587 P.2d 1234, 1235 (1978) (per curiam). The evidence must show that (1) false representations were made by defendants, (2) with knowledge of their falsity (or without knowledge of their truth or falsity), (3) in contemplation of plaintiff's reliance upon these false representations, and (4) plaintiff did rely upon them. *Kang v. Harrington,* 59 Haw. 652, 656, 587 P.2d 285, 289 (1978). Further, *plaintiff must show that he suffered substantial pecuniary damage for "[t]he aim of compensation in deceit cases is to put the plaintiff in the position he would have been had he not been defrauded." Ellis v. Crockett,* 51 Haw. 45, 52, 451 P.2d 814, 820 (1969). (Emphasis added.)

Here, Alteka's fraud claim arose out of the alleged settlement agreement negotiated by Kaiser and Enomoto, under which Shanghai was to purchase the note for $400,000. Alteka denied having authorized the settlement and sought damages for the "purported assignment and discount" of the note. After the jury found that Enomoto committed

fraud in attempting to assign the note to Shanghai, the trial court, on Windward's motion for JNOV, determined that Alteka suffered no pecuniary damages as a result of any fraud because the alleged assignment of the note *never occurred.* As a result, the trial court determined that, because Alteka did not prove pecuniary damage, the jury's verdict on the issue of fraud was not supported by the evidence.

Inasmuch as the assignment of the note to Shanghai never occurred, we hold that the trial court did not err in concluding that Alteka did not suffer "substantial pecuniary damage."

F. *The trial court did not err in allowing counsel for Windward to "allude to the Yakuza," to make reference to Alteka's "foreignness," or to suggest that Alteka's counsel was lying.*

Alteka contends that the trial court abused its discretion in allowing Windward to (1) suggest that Koichi Nomura (Nomura), Alteka's president, was connected with the Yakuza, (2) make "inappropriate comments regarding Alteka's 'foreign' background", and (3) accuse Alteka's attorney of lying before the jury. We address each contention in turn.

1. *Yakuza innuendo*

■ Under Hawai'i Rules of Evidence (HRE) Rule 403 (1993), relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ..." Alteka argues that the probative value of Windward's allusions to Alteka's Yakuza connections was substantially outweighed by the danger of unfair prejudice. Although the testimony elicited by Windward's attorney was inappropriate, it was not "unfairly prejudicial," and therefore, the trial court's decision to allow the testimony did not constitute an abuse of discretion.

In this case, an issue at trial was whether Fujita had hired Kaiser to collect the $1,171,-949.76 debt from Windward. Before trial, the trial court granted Alteka's motion in limine to exclude evidence that Kaiser had Yakuza connections on the grounds that such

reference would result in unfair prejudice to Alteka.

At trial, Alteka contended that it had no prior connections with Kaiser and suggested that Kaiser had been recruited by Enomoto to assist in committing fraud against Alteka. During cross-examination of Enomoto, counsel for Alteka asked questions suggesting that Enomoto had fabricated his claim about the settlement with Kaiser. As a result, Windward asked the trial court for reconsideration of its ruling on the motion in limine. The trial court admonished counsel for Alteka, stating that, in bringing up the "Henry Kaiser issue, there may be a point at which you may open the door."

Windward then requested that it be allowed to introduce evidence of a meeting Enomoto attended in Japan wherein members of organized crime represented Alteka. It urged introduction of this evidence to demonstrate Enomoto's state of mind regarding his dealings with Kaiser and to show that Enomoto was justified in believing that Kaiser was Alteka's agent. It also urged that the evidence was necessary to rebut the suggestion by Alteka that the Kaiser settlement was fabricated. After first hearing Enomoto's proposed testimony outside the presence of the jury, the trial court agreed to allow it for the limited purpose of showing why Enomoto met and dealt with Kaiser. The court prohibited use of the word "Yakuza," but allowed references to "organized crime or just criminal."

Subsequently, while on the stand, Enomoto described Henry Kaiser as "a muscle guy, ... [with] a long criminal record and he had—he was doing collection work for Alteka." Over objection by Alteka, he stated that the reason he dealt with Kaiser was that he believed "that Kaiser worked for Alteka. He was doing other collection work for them, and I also believe[d] that Alteka dealt with people like that." The trial court allowed Enomoto to testify regarding an alleged meeting in Tokyo with "four individuals that were there for Alteka .... [who had] tightly curled hair, permanents, [and] some missing fingers...." According to Enomoto, this experience "was a confirmation for me that

Alteka did business in an unconventional manner." Following the above-mentioned testimony, the trial court cautioned the jury that "the testimony that you just heard has been allowed for the limited purpose of showing why Thomas Enomoto met and dealt with Henry Kaiser and not for any other purpose."

We agree that Windward's counsel and Enomoto took great advantage of the trial court's evidentiary rulings. We also agree that the testimony elicited by Windward's counsel was inflammatory. However, the trial court's decision to permit Enomoto's testimony regarding his meeting with Kaiser as probative of Enomoto's state of mind involving his dealings with Kaiser and to rebut the suggestion by Alteka that the Kaiser settlement was fabricated did not constitute an abuse of discretion. Moreover, any prejudicial effect was mitigated by the fact that the trial court issued a limiting instruction advising the jury to consider the testimony only for the purpose of why the meeting took place. *See Montalvo*, 77 Hawai'i at 301, 884 P.2d at 364 (quoting *Myers v. South Seas Corp.*, 76 Hawai'i 161, 165, 871 P.2d 1231, 1235 (1994) ("As a rule, juries are presumed to be reasonable and follow all of the trial court's instructions.")). We believe that the limiting instruction sufficiently dispelled any possible prejudice or confusion. Thus, given the discretionary standard of review, we are unable to discern an abuse of discretion in the court's admission of Enomoto's testimony.

### 2. *Alteka's "foreign" background*

Alteka next argues that the trial court committed plain error in "failing to stop Windward's counsel's numerous prejudicial and inappropriate comments regarding Alteka's 'foreign' background." Because Alteka failed to object to the statements at trial, and because the alleged error fails to meet any of the three factors warranting review as plain error, as set forth in *State v. Fox*, 70 Haw. 46, 760 P.2d 670 (1988), we decline to notice plain error regarding this issue.

"It is well settled that objections not raised or properly preserved at trial will not

be considered on appeal." *Craft v. Peebles*, 78 Hawai'i 287, 294, 893 P.2d 138, 145 (1995) (citing *MPM Hawaiian, Inc. v. Amigos, Inc.*, 63 Haw. 485, 630 P.2d 1075 (1981)); *see also Pele Defense Fund v. Paty*, 73 Haw. 578, 837 P.2d 1247 (1992) (an issue not raised and properly preserved in trial court will not be considered on appeal), *cert. denied*, 507 U.S. 918, 113 S.Ct. 1277, 122 L.Ed.2d 671 (1993); HRAP 28(b)(4) (an appellant must, under the provisions of the HRAP, designate "where in the record the alleged error occurred and when it was objected to"). Alteka contends, however, that this court should hold that the trial court's decision to allow Windward's counsel's comments during closing arguments constituted plain error. We decline to do so.

This court has articulated three factors to be considered when invoking the plain error rule:

> [i]n civil cases, the plain error rule is only invoked when "justice so requires." We have taken three factors into account in deciding whether our discretionary power to notice plain error ought to be exercised in civil cases: (1) whether consideration of the issue not raised at trial requires additional facts; (2) whether its resolution will affect the integrity of the trial court's findings of fact; and (3) whether the issue is of great public import.

*Montalvo*, 77 Hawai'i at 290, 884 P.2d at 353 (quoting *State v. Fox*, 70 Haw. 46, 56 n. 2, 760 P.2d 670, 676 n. 2 (1988) (citing *Jorgensen v. Mark Constr., Inc.*, 56 Haw. 466, 476, 540 P.2d 978, 985 (1975) (other citations omitted))).

"The first factor is based on the tenet that an appellate court should not review an issue based upon an undeveloped factual record." *Montalvo*, 77 Hawai'i at 290–91, 884 P.2d at 353–54 (citing *In re Tax Appeal of Hawaiian Land Co.*, 53 Haw. 45, 53, 487 P.2d 1070, 1076 (1971)). Here, the record sufficiently raises the issue whether the comments regarding Alteka's "foreignness" should have been excluded during closing argument as being prejudicial to Alteka.

The error, if any, in the trial court's refusal to preclude Windward's counsel's commen-

tary, however, did not substantially affect the integrity of the jury's findings. During closing argument, counsel for Windward stated:

I submit to you that Alteka is not the kind of business that we want in Hawai'i. I submit to you that we want fair honest businessmen, not people who are going to use unconventional methods to have their way.

. . . .

The question is going to ask whether you should award punitive damages against Alteka. I suggest to you that you should. I'll tell you why. Because we don't want companies like Alteka. We don't want people like Nomura coming to Hawai'i. We don't want them coming to Hawai'i and buying apartments that we live in, offices that we work in, and then sending strong-arm people after us. We don't want them using their unconventional methods of doing business in Hawai'i. And you have the power, ladies and gentlemen, to make sure that Alteka and companies like them stay out of Hawai'i.

If you return a verdict for punitive damages you have sent a strong message to Alteka, its people, and companies like them, that we want Hawai'i to be safe from companies like you. We want Hawai'i to be safe from a company that is employing these kind of tactics. Stay away. We don't want you.

Alteka's blanket allegation that Windward's closing statements caused a substantial injustice against it, as "evidenced by the jury's unfair and inconsistent verdict for Windward," is insufficient to warrant application of the plain error rule. We recognize that arguments that "pit[ ] 'the community' against a nonresident corporation" carry the potential of distracting the jury from its "sworn duty to reach a fair, honest and just verdict according to the facts and evidence presented at trial." *See Westbrook v. General Tire and Rubber Co.,* 754 F.2d 1233, 1238 (5th Cir.1985), *rehearing denied,* 760 F.2d 269 (5th Cir.1985). However, we are not convinced that substantial injustice has occurred in this case. While the commentary by Windward's counsel during closing was inflammatory and may have operated to fos-

ter partiality among the jurors, when viewed in the context of the entire proceedings, it cannot be said to have prejudicially affected the jury's findings or the fairness of the proceedings. *Cf. State v. Rogan,* 91 Hawai'i 405, 414, 984 P.2d 1231, 1240 (1999) ("arguments by the prosecution contrived to stimulate racial prejudice" deprived defendant of right to impartial jury inasmuch as they "foster[ed] jury bias through racial stereotypes and group predilections, thereby promoting an atmosphere [ ] inimical to the consideration of the evidence adduced at trial"). In fact, as Alteka concedes in its opening brief, the jury did not follow Windward's suggestion in closing that punitive damages be awarded. Therefore, upon review of the record, insofar as Windward's comments do not appear to have worked a substantial injustice on Alteka, we decline to notice plain error as to this issue.

3. *Accusation that Alteka's attorney lied*

■ Alteka next maintains that the trial court committed plain error in allowing Windward's counsel to accuse Alteka's counsel of lying before the jury. For reasons similar to those discussed above, we decline to notice plain error regarding this issue.

As above, the alleged error committed by the trial court in allowing Windward's counsel's comments during closing argument did not substantially affect the integrity of the jury's findings. During closing, Windward's counsel stated:

I struggled to get the evidence in to you that that was not true, that Alteka and its counsel knew from the very start of this case that Henry Kaiser is a convicted felon that the company uses to muscle the other side, to do its dirty work for them. They tried to blame Henry Kaiser on us. They did that by confusing the issues.

This is what Alteka's case looks like. Alteka's case is full of confusion, misstatements of fact and lies.

. . . .

I submit my client's case to you. I submit to you that we have proved everything that we said we were going to prove in this case from the start. I submit to

you that we have been honest. I submit to you that we have told you the truth.

I ask that you listen carefully to the arguments of Mr. Au. I ask you to weigh carefully whether what he tells you is the truth.

. . . .

My blood just boils when I hear Mr. Au make these half true and deliberate misstatements of the fact [sic]. They foist this guy Henry Kaiser on us and try and blame us for trying to pull a scam on Alteka. . . .

While the commentary by Windward's counsel during closing argument may have been inappropriate, its passing mention cannot be said to have so affected the jury's findings or the fairness of the proceedings. Accordingly, because Alteka has failed to establish what, if any, substantial injustice Windward's comments during closing argument worked on it, we decline to notice plain error as to this issue.

G. *The trial court erred in denying Alteka attorneys' fees and costs for its successful defense of Shanghai's claims inasmuch as Alteka, on balance, prevailed on the issues at trial.*

▆▆ Alteka argues that, because the trial court determined that it was the prevailing party against Shanghai in civil No. 93–2683–07, it was entitled to attorneys' fees. Shanghai argues, on the other hand, that (1) Alteka did not raise the issue of attorneys' fees until its supplemental memorandum in support of its motion for reconsideration, (2) the trial court did not err in refusing to increase the damage award because the jury intended to award Alteka no more than $1,171,949, (3) attorneys' fees against Shanghai was properly denied because Windward, Enomoto, and Shanghai effectively constituted a single party, and Windward was the prevailing party in Civil No. 95–3483–09, and (4) even if Alteka was the prevailing party against Shanghai, it was not entitled to attorneys' fees under HRS § 607–14 (1993).[9]

▆▆ "Ordinarily, attorneys' fees cannot be awarded as damages or costs unless so provided by statute, stipulation, or agreement." *Weinberg v. Mauch,* 78 Hawai'i 40, 53, 890 P.2d 277, 290 (1995) (quoting *S. Utsunomiya Enters., Inc. v. Moomuku Country Club,* 76 Hawai'i 396, 399 n. 3, 879 P.2d 501, 504 n. 3 (1994) (citations omitted)), *reconsideration denied,* 78 Hawai'i 421, 895 P.2d 172 (1995). Under HRS § 607–14,[10] attorneys' fees may be awarded in three types of cases: (1) in all actions in the nature of assumpsit; (2) in all actions on a promissory note; and (3) in contracts in writing that provide for an attorneys' fee. *Eastman v. McGowan,* 86 Hawai'i 21, 31, 946 P.2d 1317, 1327 (1997). This court has previously defined assumpsit as "a common law form of action which allows for the recovery of damages for the non-performance of a contract, either express or implied, written or verbal, as well as quasi contractual obligations." *Id.* at 31, 946 P.2d at 1327 (quoting *S. Utsunomiya Enterprises,* 76 Hawai'i at 399–400, 879 P.2d at 504–505 (citing *Schulz v. Honsador, Inc.,* 67 Haw. 433, 435–36, 690 P.2d 279, 281 (1984)) (citations omitted))).

In its complaint, Shanghai sued Alteka for specific performance of Alteka's alleged promise to assign the note to Shanghai for $400,000, or, in the alternative, for damages for breach of the alleged agreement to assign.[11] Shanghai's complaint therefore combines assumpsit and non-assumpsit claims.

9. As an initial matter, Shanghai's contention that Alteka did not raise the issue of attorneys' fees until its motion for reconsideration is incorrect. Alteka requested fees and costs as damages in its complaint, first amended complaint, and second amended complaint. It also requested fees and costs in its settlement conference statement filed on June 27, 1997 and in its motion for attorneys' fees as to the claims of Shanghai Investment Company, Inc., filed on October 8, 1996.

10. HRS § 607–14 provides in relevant part:
In all the courts, in all actions in the nature of assumpsit and in all actions on a promissory note or other contract in writing that provides for an attorney's fee, there shall be taxed as attorneys' fees, to be paid by the losing party and to be included in the sum for which execution may issue, a fee that the court determines to be reasonable[.]

11. Shanghai's complaint specifically alleged: "As an alternative to Count I, or if it is determined that specific performance is not available, then Shanghai alleges that it has been damaged as a result of Alteka's breach and that it is entitled to recover such damages."

"[I]n awarding attorneys' fees in a case involving both assumpsit and non-assumpsit claims, a court must base its award of fees, if practicable, on an apportionment of the fees claimed between assumpsit and non-assumpsit claims." *TSA International,* 92 Hawai'i at 265, 990 P.2d at 735 (citation omitted). Although Shanghai's specific performance claim is not "in the nature of assumpsit," *see Lee v. Aiu,* 85 Hawai'i 19, 32, 936 P.2d 655, 668 (1997) ("[a] suit to enforce an agreement is a suit for specific performance and is not an action in the nature of assumpsit"), its claim against Alteka for breach of the agreement to discount the note is, and HRS § 607–14 is applicable to that portion. *See Schulz,* 67 Haw. at 436, 690 P.2d at 282 (where action combined assumpsit and non-assumpsit claims and defendants sought indemnification from third party on the basis of warranty theory, third-party action was in nature of assumpsit for purposes of HRS § 607–14).

▮ The burden is on the party opposing the taxation of fees under § 607–14 to show that an assumpsit claim was not actually litigated. *Honsador,* 67 Haw. at 437, 690 P.2d at 282. No such showing has been made by Shanghai in this case. To the contrary, the record reveals that the jury's special verdict includes a query on damages to Shanghai and that instructions on contract damages were submitted to the jury. Shanghai's damages claim was therefore in the nature of assumpsit.

▮ The trial court erred, however, in denying Alteka's request for attorneys' fees and costs inasmuch as Alteka was, on balance, the "prevailing party" in the case. With regard to a predecessor statute of HRS § 607–14, this court observed:

To be entitled ... to attorney's fees the awardee must have been the successful party in the proceedings, and the fees awarded, if any, must be reasonable....

... We think that the pleadings and the proof call for the application of the rule, broadly stated, that where a party prevails on the disputed main issue, even though not to the extent of his original contention, he will be deemed to be the successful

party for the purpose of taxing costs and attorney's fees.

*Food Pantry,* 58 Haw. at 619–20, 575 P.2d at 879. In awarding attorneys' fees, the court "is required to first identify the principal issues raised by the pleadings and proof in a particular case, *and then determine, on balance, which party prevailed on the issues.*" *Fought & Co., Inc. v. Steel Engineering and Erection, Inc.,* 87 Hawai'i 37, 53, 951 P.2d 487, 503 (1998) (citing *MFD Partners v. Murphy,* 9 Haw.App. 509, 514, 850 P.2d 713, 716 (App.1992) (emphasis added))).

In Civil No. 94–2683–07, Shanghai sued Alteka for specific performance of a purported agreement to assign a promissory note, or in the alternative, damages for breach of the agreement to assign. In Civil No. 95–3483–09, Alteka sued Windward for return of its deposit. In response, Windward counterclaimed, alleging, *inter alia,* that, as a result of Alteka's breach of the agreement, Windward was entitled to keep Alteka's $5 million earnest money deposit. The cases were consolidated on January 19, 1996. Thus, the issues presented by the consolidated cases included, *inter alia:* (1) specific performance/breach of settlement agreement; (2) breach of the original agreement; and (3) breach of the amended agreement. The jury found that (1) Shanghai was not entitled to specific performance from Alteka and that Alteka did not breach any purported settlement agreement, (2) Alteka breached the original agreement, and (3) Windward breached the amended agreement.

In granting Windward's request for attorney's fees from Alteka and denying Alteka's request for attorney's fees from Shanghai, the trial court apparently determined, consistent with this court's holding in *Food Pantry,* that Windward prevailed on the principal issue raised by the pleadings and proof—whether Alteka breached the agreement. The trial court also determined that Windward and Shanghai were, for all intents and purposes, one party. It therefore denied Alteka's request for attorney's fees against Shanghai because, on balance, Windward was the prevailing party in the case.

We held, in section III.B., *supra,* that notwithstanding Alteka's breach of the original

agreement, Windward was not entitled to the $5 million damage award against Alteka inasmuch as Windward did not adduce evidence at trial that the $5 million bore a reasonable relationship to its actual loss. Accordingly, because Alteka (1) prevailed on its claim to the deposit against Windward and (2) successfully defended against Shanghai's specific performance/breach claim, it is, on balance, the prevailing party on the issues in the case. Accordingly, Alteka is entitled to reasonable attorneys' fees against Windward and Shanghai in an amount to be determined by the trial court on remand.

### H. *The trial court did not abuse its discretion in granting Alteka's stay on appeal.*

Windward contends that the trial court abused its discretion in granting Alteka's motion for stay because it failed to require Alteka to (1) post a supersedeas bond and/or (2) grant Windward a mortgage interest in its real property. We disagree as to both contentions.

#### 1. *Supersedeas Bond*

Under HRCP Rule 62(d) (1990),[12] an appellant may, upon posting a supersedeas bond, obtain a stay upon appeal. *See also MDG Supply, Inc. v. Diversified Inv., Inc.,* 51 Haw. 375, 381, 463 P.2d 525, 529 (1969) ("[u]nder H.R.C.P. Rule 62(d), a party taking an appeal from a judgment must file a supersedeas bond in order to stay its enforcement"), *rehearing denied,* 51 Haw. 479, 463 P.2d 525 (1969), *cert denied,* 400 U.S. 868, 91 S.Ct. 99, 27 L.Ed.2d 108 (1970). This court has also noted that

> [t]he necessary implication is that without giving a supersedeas bond *or unless otherwise ordered by the Court,* the order is not stayed, even though an appeal is pending. Otherwise a person could completely frustrate judicial proceedings by disobeying an order of the Court during the pendency of an appeal without giving any security that

it will be complied with in the event of affirmance.

*MDG Supply,* 51 Haw. at 381, 463 P.2d at 529 (emphasis added) (quoting *Blackwelder v. Crooks,* 151 F.Supp. 26, 28 (D.C.1957)). The purpose of posting a supersedeas bond is to preserve the status quo pending appeal. *Poplar Grove Planting and Refining Co., Inc. v. Bache Halsey Stuart, Inc.,* 600 F.2d 1189, 1190–91 (5th Cir.1979)).

Other jurisdictions have indicated that "the rule and the inherent discretion and power of the trial court allow for flexibility in the determination of the nature and extent of the security required to stay the execution of the judgment pending appeal." *Bruce Church, Inc. v. Superior Court,* 160 Ariz. 514, 774 P.2d 818, 821 (App.1989) (citing *Trans World Airlines, Inc. v. Hughes,* 515 F.2d 173 (2d. Cir.1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976) (other citation omitted)). *See also* 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure: *Stay Upon Appeal* § 2905, at 522 (1995) (courts have inherent power to provide for a bond in a lesser amount or to permit security other than the bond); *International Telemeter Corp. v. Hamlin Int'l Corp.,* 754 F.2d 1492, 1495 (9th Cir.1985) ("the court has discretion to allow other forms of judgment guarantee" where debtors present financially secure plan) (citing *Poplar Grove,* 600 F.2d at 1191). The burden to provide a secure alternative rests on the judgment debtor. *Poplar Grove,* 600 F.2d at 1191.

We believe the approach taken by the *Bruce Church* and *Poplar Grove* courts to be the appropriate one. Thus,

> [i]f a judgment debtor objectively demonstrates a present financial ability to facilely respond to a money judgment and presents to the court a financially secure plan for maintaining that same degree of solvency during the period of an appeal, the court may then exercise a discretion to substitute some form of guaranty of judg-

---

12. HRCP Rule 62(d) provides:

> **Stay Upon Appeal.** When an appeal is taken the appellant by giving a supersedeas bond may obtain a stay subject to the exceptions contained in subdivision (a) of this rule. The

bond may be given at or after the time of filing the notice of appeal or of procuring the order allowing the appeal, as the case may be. The stay is effective when the supersedeas bond is approved by the court.

ment responsibility for the usual supersedeas bond. Contrariwise, if the judgment debtor's present financial condition is such that the posting of a full bond would impose an undue financial burden, the court similarly is free to exercise a discretion to fashion some other arrangement for substitute security through an appropriate restraint on the judgment debtor's financial dealings, which would furnish equal protection to the judgment creditor.

*Poplar Grove*, 600 F.2d at 1191 (citations omitted). Moreover, the fashioning of substitute security and its supervision pending appeal are the duty of the trial court. *Bruce Church*, 774 P.2d at 821 (citing *Poplar Grove*, 600 F.2d at 1191).

■ In this case, the trial court granted Alteka leave to provide Windward with alternative security in lieu of a supersedeas bond. At the hearing on Alteka's motion for stay, the trial court orally ruled that:

> With regard to the motion for stay pending appeal, and for the pledge of interest and real property, despite the objection by Windward Park, the Court will grant the motion. And it will be with the understanding that the matter will be returned back for purpose of requiring additional security in the event that an appraisal to be provided by Alteka on an annual basis shows that the valuation of the property has decreased below that 15 million dollar figure. And that's to insure that the real estate has a value of approximately three times the judgment amount.
>
> And the Court further orders that there be placed in an interest bearing account one hundred thousand dollars to be applied toward any escrow costs that are required to satisfy the judgment.
>
> .... this Court retains jurisdiction for purpose of increasing or making sure that there's adequate security. And the responsibility will be on Alteka's part to assure that the appraisal is kept current on an annual basis.

The trial court's corresponding written order provided in relevant part:

> Security on appeal will include Windward Park, Inc.'s May 23, 1997 judgment lien which encumbers Alteka Co., Ltd.'s

Hawai'i property ("the Property") and deposit by Alteka Co., Ltd. of $100,000 into a court-supervised interest-bearing account. If the May 12, 1997 Amended Final Judgment in favor of Windward Park, Inc. is affirmed, Windward Park, Inc. will be entitled to an order which will allow the funds in this account to be used by Windward Park, Inc. to defray out-of-pocket expenses, escrow costs and legal fees incurred by Windward Park, Inc., in causing Alteka Co., Ltd.'s property to be sold in satisfaction of the judgment.

> Alteka will provide current proof of insurance within 45 days of the entry of the order. On or before may 1 of each year the appeal is pending, Alteka Co., Ltd. will also (1) provide to the Court and Windward Park, Inc. a summary appraisal of the market value of the Property, and (2) provide Windward Park, Inc. copies of certificates demonstrating that it has insurance on the Property.

> The Court retains limited jurisdiction to modify this stay or security as may be necessary to protect the interests of all parties.

We hold that the trial court, in its discretion, may allow a party to provide alternative security in lieu of a supersedeas bond. Here, Windward was provided with both a judgment lien on Alteka's real property, with a tax assessment value of at least $15 million, and $100,000 in a court-supervised interest-bearing account. Because Alteka demonstrated that it had the "financial strength to proficiently respond to a money judgment and that the same financial strength and ability to respond will remain undiluted during appeal[,]" we hold that the trial court did not abuse its discretion in allowing Alteka to provide alternative security in lieu of a supersedeas bond.

### 2. *Mortgage Interest*

■ Lastly, Windward contends that the trial court erred in failing to grant Windward a mortgage interest in Alteka's real property. In its motion for stay, Alteka stated that it intended to "pledge" an interest in its real property to secure payment of the amended

final judgment. Windward argues that, because a judgment debtor does not pledge or otherwise grant a judgment lien, "the obvious inference was that Alteka would grant Windward a mortgage interest in its real property in exchange for a stay on appeal."

Windward now contends that, because the judgment lien granted by the trial court "exposes Windward to unreasonable burdens and risks in obtaining payment" and will provide Alteka with an opportunity to delay the foreclosure process, the trial court abused its discretion in not requiring Alteka to grant Windward a mortgage interest in its real property. This argument is without merit.

At the hearing on the motion for stay, Windward did not ask the trial court to require Alteka to grant a mortgage interest in its real property. Moreover, on appeal, Windward cites no authority for the proposition that a trial court abuses its discretion in allowing a judgment lien on real property rather than a mortgage interest. Finally, as discussed above, the lien on Alteka's real property with a tax assessed and appraised value of $15 million together with a $100,000 interest bearing court-controlled account, provided Windward with adequate alternative security. As such, the trial court did not err in declining to require Alteka to grant to Windward a mortgage interest in its real property.

### IV. *CONCLUSION*

Based on the foregoing, we hold that the trial court did not err in: (1) allowing Windward's third counterclaim; (2) denying Alteka's motion for JNOV on the issue of jury verdict inconsistency; (3) denying Windward's motion for JNOV on the issue of the enforceability of the amendment; (4) denying fraud damages to Alteka; (5) allowing Enomoto's testimony; and (6) granting Alteka's stay on appeal.

We hold, however, that the trial court erred in (1) awarding Windward $5 million in damages against Alteka; and (2) denying Alteka's request for attorneys' fees and costs incurred in successfully defending against the claims made by Shanghai. Although

Windward had a full and fair opportunity at trial to adduce evidence that the $5 million bore a reasonable relationship to its actual loss, it failed to do so. We therefore vacate the $5 million damage award to Windward and remand to the trial court with instructions to (1) enter judgment in favor Alteka for $1,171,949.76 plus interest and (2) determine and award reasonable attorneys' fees to Alteka against Windward and Shanghai in accordance with this opinion. In all other respects, we affirm.